# United States Court of Appeals
## For the First Circuit

No. 05-1142

UNITED STATES OF AMERICA,

Appellee,

v.

TIMI WALLACE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Cyr, Senior Circuit Judge.

Judith H. Mizner, Federal Defenders Office, District of Massachusetts, for appellant.
Robret Clark Corrente, United States Attorney, with whom Domald C. Lockhart and Lee H. Vilker, Assistant United States Attorneys, were on brief for appellee.

August 14, 2006

**LIPEZ, Circuit Judge**. Timi Wallace was convicted by a jury of charges related to the armed robbery of a firearms store in Providence, Rhode Island. The district court imposed a 25-year sentence, 9 years more than the high end of the guidelines range calculated in the pre-sentence report. On appeal, Wallace challenges his conviction on several grounds, including errors in the prosecutor's cross-examination of the defendant and closing argument, the admission of certain evidence, and errors in the district court's jury instructions.

Wallace also challenges his sentence, imposed shortly after United States v. Booker, 543 U.S. 220 (2005), was decided. Wallace argues that the sentence is based on legal errors in the district court's calculation of the advisory guidelines range and its application of guidelines factors to justify an upward departure from the advisory guidelines range. Wallace also challenges the reasonableness of his sentence under the sentencing factors set forth in 18 U.S.C. § 3553(a).

We affirm Wallace's conviction, but remand for re-sentencing based on errors in the district court's application of guidelines provisions to depart upward from the advisory guidelines range.

## A. The robbery

On September 25, 2000, a man posing as a customer entered D&B Guns, a federally-licensed firearms dealership in Providence, Rhode Island. The store's owner, Donn DiBiasio, and his assistant, Donna Gallinelli, were working at the store that day.[1] The customer, later identified as Nickoyan Wallace ("Nickoyan") (a brother of the defendant), asked to see certain ammunition clips for a semi-automatic pistol. After Gallinelli walked behind the counter to retrieve the keys to open the display case, a second man entered the store, brandishing a "TEC-9" semi-automatic weapon. DiBiasio later identified this second man as Timi Wallace, the defendant-appellant. According to DiBiasio and Gallinelli, Timi Wallace ran up to DiBiasio, pointed the TEC-9 at him, and shouted, "Don't move." Gallinelli attempted to flee, at which point Nickoyan also pulled out a handgun, pointed it at Gallinelli, and told her to stop. Nickoyan then jumped over the counter and ordered Gallinelli to open the display case. When Gallinelli opened the case for the small caliber guns, Nickoyan told her to open the high caliber gun case instead. He removed six high caliber handguns, stuffing them into a bag. Timi Wallace told Nickoyan to hurry up, and they fled the store with the stolen guns.

---

[1] Another store clerk was in the basement cellar of the store, where he hid as the events described herein unfolded. This individual did not testify at trial.

DiBiasio called 9-1-1. Police found a cellphone left behind in the store and obtained phone records that showed incoming calls from one of Nickoyan's and Timi Wallace's brothers, Kamal Wallace. DiBiasio provided the police with a list of the stolen firearms. DiBiasio and Gallinelli described the men to the police and looked at a photo spread in order to identify the perpetrators. Nickoyan and Timi Wallace were not among those pictured in the first set of photographs the police showed them. Gallinelli made no selections from those pictures. DiBiasio said that two of the pictures were possibilities, but he was not certain. One of the pictures he flagged was that of Kamal Wallace. Approximately nine days later, the police asked Gallinelli and DiBiasio to view additional photo spreads, which included Nickoyan and Timi Wallace's pictures. Gallinelli identified Nickoyan as the man who pointed a gun at her and told her to open the display case, but did not select Timi Wallace as the other perpetrator. DiBiasio identified Timi Wallace as the man who pointed a gun at him, but did not select Nickoyan as the other perpetrator.

Based on the information received, the police conducted surveillance of a third-floor apartment at 181 Pleasant Street on October 5, 2000, ten days after the robbery. Nickoyan was in the apartment at the time. While the police were approaching the house to gain entry, Nickoyan placed a phone call to Timi Wallace, who was not in the apartment. The police arrested Nickoyan. They

-4-

searched the apartment and found five of the six stolen handguns, a loaded TEC-9 semi-automatic, a Florida driver's license bearing a photograph of Nickoyan but listing a false name, two other loaded firearms, ammunition, and cash.

The apartment also contained a variety of documents relating to Timi Wallace, including his birth certificate, his marriage license, a divorce decree, medical and training certificates, a shipping invoice for a Land Rover, and family photographs. The police later discovered that the apartment was rented to Timi Wallace through a "straw co-renter," Lelita McKetty, who signed her name to the lease but did not pay rent or live in the apartment. The police believed that Timi Wallace co-signed the lease using a false name, "Devon Lewis," and later uncovered a Florida driver's license bearing a photograph of Timi Wallace but issued in the name "Devon Myron Lewis."

## B. The indictment and trial

On October 26, 2000, a federal grand jury sitting in the District of Rhode Island returned a four-count indictment against Nickoyan and Timi Wallace. Count I charged that they obtained six firearms by robbery, in violation of 18 U.S.C. § 1951. Count II charged that they conspired to obtain the six firearms by robbery, also in violation of 18 U.S.C. § 1951. Count III charged that they stole the six guns from a federally-licensed firearms dealer, in violation of 18 U.S.C. § 922(u). Count IV charged that they

-5-

brandished firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  A jury convicted Nickoyan on all four counts and he was sentenced to 204 months (approximately 17 years) in prison.

Timi Wallace evaded arrest until July 2004.  On August 18, 2004, a grand jury returned a superseding indictment essentially identical to the first indictment, except that, in response to Blakely v. Washington, 542 U.S. 296 (2004), it added sentencing guidelines allegations.[2]  At the trial, both DiBiasio and Gallinelli testified, and identified Timi Wallace as the second

---

[2] Post-Booker, it is clear that sentencing guidelines enhancements do not have to be found by a jury.  However, in the uncertainty following Blakely, sentencing guidelines allegations were included in the indictment.  These allegations were: (1) "During the commission of the offenses charged in Counts 1-4 . . . the defendant . . . did use a firearm, as described in U.S.S.G. § 2B3.1(b)(2)(B)"; (2) "During the commission of the offenses charged in Counts 1-4 . . ., the defendant . . . did brandish and possess a firearm, as described in U.S.S.G. § 2B3.1(b)(2)(B)"; (3) "The defendant . . . did physically restrain Donna Gallinelli and Donn DiBiasio in order to facilitate the commission of the offenses charged in Counts 1-3 . . . and to facilitate escape, as described in U.S.S.G. § 2B3.1(b)(4)(B)"; (4) "The object of the offenses charged in Counts 1-3 . . . was the taking of one or more firearms, and in the course of committing the offense charged in Counts 1-3 . . .the defendant . . . did in fact take one or more firearms, as described in U.S.S.G. § 2B3.1(b)(6)"; (5) "The defendant . . . possessed a high-capacity, semi-automatic firearm, as defined in U.S.S.G. § 5K2.17, to wit an Intertec model TEC-DC9, 9mm semi-automatic pistol, in connection with a crime of violence, as defined in U.S.S.G. § 4B1.2(a), to wit the offenses charged in Counts 1 and 2 . . . as described in U.S.S.G. § 5K2.17"; and (6) "In committing the offenses charged in Counts 1-4 . . . the defendant . . . used and possessed a weapon and dangerous instrumentality, in a manner that endangered others, as described in U.S.S.G. § 5K2.6."

man who robbed D&B Guns.  DiBiasio, who had been a firearms dealer for over 40 years, testified that the gun that Timi Wallace had pointed at his face was a particular vintage of the TEC-9 semi-automatic, and that this gun matched the TEC-9 found in the apartment.  McKetty, the "straw" co-renter of the apartment where the guns were found, testified that Timi Wallace asked her to co-sign the lease and that she herself never paid the rent nor lived in the apartment.

Timi Wallace testified in his own defense.  Wallace conceded that he had asked McKetty to sign the lease to the apartment, where Wallace lived with Nickoyan for about two weeks in June; that Wallace had used the Florida driver's license with the "Devon Myron Lewis" alias; that the personal documents found in the apartment all belonged to him; that he had been to D&B Guns on several occasions; and that, by late 2000, he was aware he had been charged in the robbery and thereafter lived under aliases. However, Wallace explained that he never paid rent for the apartment nor signed the lease under his alias or any other name; that he had no idea how his personal documents came to be present in the apartment; and that he was neither living in the apartment at the time of the robbery nor when the weapons were found shortly thereafter.  Wallace testified that, in early July 2000, he moved to Arizona with no intention of returning to Rhode Island. Finally, he stated that, on the day of the robbery, he was staying

-7-

at the Crosslands Hotel in Tucson, Arizona using his alias "Devon Lewis."

The government challenged Timi Wallace's alibi. It produced records of the Crosslands Hotel indicating that he had checked in on September 2, 2000, but then checked out on September 13, twelve days before the robbery. When Timi Wallace then suggested that he might have been staying at a Motel 6 across the street, the government produced records from Motel 6 showing that no one by his name or alias had stayed at Motel 6 during that time. The government also introduced records from a Rhode Island shipping company showing that Timi Wallace, under the alias "Myron Lewis," appeared in person in Rhode Island on September 14, 2000, paying cash to have his Land Rover shipped to Arizona, where he did not pick up the car until October 9, 2000, two weeks after the robbery. The government also produced evidence of a rent payment on the 181 Pleasant Street apartment made on September 26, the day after the robbery, issued in the name of Lelita McKetty, who had testified that she never made rent payments on the apartment. The government introduced records from an airline demonstrating that a "Devon Lewis" had booked a roundtrip ticket from Providence to Phoenix, scheduled to leave on August 30 and return on September 20, although no "Devon Lewis" ever boarded either flight. The government argued that this evidence undercut Timi Wallace's story

that he had permanently relocated from Rhode Island in July 2000 and was not in Rhode Island at the time of the robbery.

On October 15, 2004, following the four-day trial, the jury convicted Timi Wallace on all four counts. Moreover, the jury found beyond a reasonable doubt that each of the seven alleged sentencing guidelines enhancements applied. Finally, the jury found that Wallace "willfully obstructed or impeded or attempted to obstruct or impede the administration of justice during the course of the prosecution of this case by committing perjury."

## C. Sentencing

### 1. The pre-sentence report

The pre-sentence report ("PSR") recommended a sentencing range based on its application of the United States Sentencing Guidelines ("U.S.S.G.").[3] The PSR grouped Counts I and II (armed

---

[3] The PSR applied the United States Sentencing Guidelines Manual incorporating amendments effective November 1, 1998, explaining that "it is most beneficial to the defendant." Typically, a sentencing court must use the edition of the guidelines manual effective at the time of sentencing. See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("Barring any ex post facto problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing."). However, we presume that the probation office here was attempting to avoid the ex post facto concerns that are implicated when amendments to the sentencing guidelines, made after the underlying offense was committed, would increase the sentence for that offense. See United States v. Maldonado, 242 F.3d 1, 5 (1st Cir. 2001) ("[W]e ordinarily employ the guidelines in effect at sentencing only where they are as lenient as those in effect at the time of the offense; when the guidelines have been made more severe in the interim, the version in effect at the time of the crime is normally used, as a matter of policy and to avoid any hint of ex post facto increase in penalty."). In any event, neither party here objected to the use

robbery and conspiracy to commit armed robbery) and found a base offense level of 20 under the sentencing guidelines. It then applied a two-level enhancement for the physical restraint of victims under U.S.S.G. § 2B3.1(b)(4)(B); a one-level enhancement for theft of a firearm under U.S.S.G. § 2B3.1(b)(6); and a two-level enhancement for obstruction of justice through perjury at trial under U.S.S.G. § 3C1.1. The adjusted offense level for Counts I and II was 25.

For Count III (theft of a firearm from a licenced firearms business), the PSR found a base offense level of 20. It then applied a three-level enhancement, because the number of firearms unlawfully received or possessed during the offense was between 8 and 12, under U.S.S.G. § 2K2.1(b)(1)(C); a two-level enhancement, because firearms were stolen, under U.S.S.G. § 2K2.1(b)(4); a two-level enhancement, for physical restraint of victims, under U.S.S.G. § 3A1.3; and a two-level enhancement, for obstruction of justice through perjury at trial, under U.S.S.G. § 3C1.1. The adjusted offense level for Count III was 29.

Since Counts I-III involved the same victims and a common scheme or plan, the PSR calculated the adjusted offense level for these counts at 29, taking the higher of the two adjusted offense

---

of the 1998 guidelines manual edition at sentencing or on appeal. We therefore apply the 1998 edition of the guidelines manual and will indicate, where necessary, if the provisions of the manual cited at sentencing have changed in the current edition.

levels pursuant to U.S.S.G. § 3D1.2(b). Count IV (brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)) mandates a seven-year (84 months) consecutive term.

Addressing the defendant's criminal history, the PSR noted that he had no criminal convictions, and accordingly designated a criminal history category of I. The criminal history category, in combination with the adjusted offense level of 29, yielded a guidelines sentencing range of 87-108 months on Counts I-III, running consecutively with the 84 months mandated under Count IV. The PSR mandated a sentence at the high end of the guidelines range, noting "several aggravating factors in the defendant's history," including that the offense was "particularly serious and brazen," and that the defendant has a pending murder charge and was a fugitive from justice when this offense was committed. The PSR also stated that the district court might consider applying a sentencing enhancement under U.S.S.G. § 5K2.17 for using a firearm in connection with a crime of violence, although it noted that "those factors were used in calculation of the defendant's base level offense."

The defendant objected to the PSR's inclusion of several enhancement provisions, including the enhancements for obstruction of justice, restraint of victims, possession of 8 firearms during the commission of the offense, and possession of stolen firearms.

He also objected to the lack of a downward departure based on his minimal role in the offense.

## 2. Sentencing hearing

At sentencing, the defendant requested a sentence at the low end of the PSR's recommended guidelines range. The government recommended a sentence in the middle of the guidelines range, 100 months, with a seven-year consecutive sentence. The district court rejected the parties' recommendations, concluding that the guidelines range recommended in the PSR was insufficient in this case:

> [T]he Supreme Court has made clear that the application of the guidelines are advisory. However . . . the Court has instructed district courts to consult the guidelines and to take them into account in sentencing. I have consulted the guidelines in this case. I've consulted them in great detail. And it appears to this Court that the guidelines, that even when I look at the high end of the guideline range as applied to Counts I to III and the seven years added for Count IV do not yield a sentence that is sufficient in my view to meet the objectives of the Sentencing Reform Act at § 3553(a).

The court then considered a number of factors, including the nature of the guns stolen, Wallace's flight from justice, the terror inflicted upon the victims, and Wallace's commission of the crime while under indictment for another felony. After describing how these factors fit into several grounds for upward departures in the sentencing guidelines, the district court departed upward five levels to an offense level of 34, and calculated a new criminal

history category of III.  The court imposed 216 months for Counts I and II, 120 months for Count III to be served concurrently with Counts I and II, and 84 months for Count IV to be served consecutively with Counts I-III.  In total, the district court sentenced Timi Wallace to 300 months, or 25 years in prison.  On appeal, Wallace challenges his conviction and his sentence.

## II.

### A.  Conviction

Wallace challenges his conviction on four grounds. First, he argues that the government improperly cross-examined him on the credibility of other witnesses' testimony.  Second, he argues that the prosecution's closing argument contained several errors that unfairly prejudiced him.  Third, he argues that the district court erred in admitting evidence of an airline reservation for a flight that was never taken.  Fourth, he challenges the district court's jury instructions on the elements of the § 924(c) count, flight as evidence of consciousness of guilt, and reasonable doubt.

#### 1.  Cross-examination about other witnesses' testimony

Wallace argues that the government improperly cross-examined him about whether the testimony of other trial witnesses was "wrong" or "mistaken" and whether he "disputed" or "disagreed" with that testimony.  Wallace contends that this line of

questioning was an inappropriate incursion into the jury's role of determining credibility.

Because the defendant did not object to this questioning at the time of the trial, we review this argument for plain error. See United States v. Gaines, 170 F.3d 72, 82 (1st Cir. 1999). "To prevail on a claim of plain error, [the defendant] bears the burden of showing that (1) an error occurred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Medina-Martinez, 396 F.3d 1, 8 (1st Cir. 2005).

We find no plain error here. To be sure, "it is improper for an attorney to ask a witness whether another witness lied on the stand. Underlying this rule is the concept that credibility judgments are for the jury, not witnesses, to make." United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003) (internal citations omitted). However, we "also [have] clarified that asking whether a witness was 'wrong' or 'mistaken' is proper because the witness is not required to choose between conceding the point or branding another witness as a liar." Id. (emphasis added, internal quotation marks and citation omitted); see also United States v. Gaind, 31 F.3d 73, 77 (2d Cir. 1994) ("Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to

condemn the prior witness as a purveyor of deliberate falsehood."). Here, the prosecution's questioning of Wallace did not cross the line. He did not ask Wallace whether any of the other witnesses "lied." Instead, he pushed Wallace on how his story comported with other witnesses' conflicting statements. There was no error.

## 2. Closing argument

Wallace advances four arguments of error in the prosecution's closing argument. First, he claims that the prosecution's reference to Wallace's flight from Rhode Island and his use of aliases as consciousness-of-guilt evidence was misleading because, as the government knew, Wallace had been charged with a felony offense (the murder of his brother Tasfa) six months prior to the robbery. Second, he asserts that the prosecutor misstated the defendant's testimony about how he got his Florida license with the alias. Third, he says that the prosecutor misstated his testimony about his phone conversation with Nickoyan. Fourth, he argues that the prosecutor erred by referring to the TEC-9 admitted into evidence as the TEC-9 used in the robbery. Because the defendant failed to raise any of these objections to the closing argument at trial, we review for plain error. See United States v. Ortiz, 447 F.3d 28, 35 (1st Cir. 2006).

## a. Reference to flight and aliases as evidence of consciousness of guilt

During closing arguments, the prosecution argued that the defendant had fled, under an alias, because he had been involved in

-15-

the Rhode Island robbery. The defendant argues that the prosecutor improperly invoked this argument because he knew that the inference of consciousness-of-guilt in the robbery case was undermined by evidence not available to the jury, namely, a pending murder charge. Although the jury was not aware of this fact, Timi and Nickoyan Wallace were charged with the murder of their brother in Massachusetts in March 2000, several months before the robbery. According to the defendant, the murder charge was arguably the real cause of his flight and use of aliases. The defendant argues that the prosecutor's remarks were therefore misleading. See United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (noting that it is improper for a prosecutor "to imply reliance on a fact that the prosecutor knows to be untrue"); see also United States v. Blueford, 312 F.3d 962, 968 (9th Cir. 2002) ("[I]t is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt.").

We have previously noted that "[f]light evidence is controversial and must be handled with care." United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005); see also United States v. Hernandez-Bermudez, 857 F.2d 50, 54 (1st Cir. 1988) ("We urge . . . that courts exercise caution in admitting this type of evidence. . . . [A]t least in many cases, [flight] evidence is only marginally probative as to the ultimate issue of guilt or innocence." (internal quotation marks and citations omitted)). The

-16-

specific facts of this case, where a pending prior felony charge could explain the defendant's actions, illustrate the need for caution in the use of consciousness-of-guilt evidence.

However, we have rejected, in United States v. Boyle, 675 F.2d 430 (1st Cir. 1982), the argument that evidence of the use of an alias may never support an inference of consciousness-of-guilt when another charge is pending. See id. at 432-33. In that case, the defendant argued that the court erred in admitting evidence of his use of an alias in light of outstanding warrants for other crimes that he was seeking to evade prior to the robbery for which he was currently at trial. Id. at 432. In considering his argument, we rejected a broad rule that would bar alias evidence whenever a defendant commits more than one crime, noting that "[s]uch a rule would ignore the substantial possibility that the defendant is using the alias to evade detection for all his crimes, including the one charged." Id. at 433. Focusing on the specific facts in Boyle, we concluded that the district court did not err in admitting the alias evidence in the robbery trial, noting that the defendant had used his alias within days of the alleged robbery and that it was reasonable to infer "that the defendant was seeking to conceal his true identity from police investigating this fresh crime." Id. at 432.

Examining the specific facts here, we also find no error. The record supports the prosecution's theory that Wallace's flight

and use of aliases were relevant consciousness-of-guilt evidence as to both the robbery and the murder charges. While Wallace may have fled Massachusetts and used an alias prior to the robbery to evade the murder charge, the record evidence also indicates that Wallace fled Rhode Island under an alias after the robbery and that he remained in flight and continued to live under an alias after he received a call from his brother when the police were arresting him for the robbery.

At the very least, the prosecutor's reference to the flight and use of an alias do not constitute plain error. Any overstatements by the prosecution in its closing were mitigated by the district court's careful instructions that flight did not necessarily reflect a guilty conscience and that the jury "should consider that there may be reasons for Timi Wallace's actions that are fully consistent with innocence." Furthermore, given the crushing weight of the other evidence against the defendant in this case (including eyewitness identification and the recovery of five of the stolen guns and the weapon allegedly used in the robbery in his apartment), we cannot conclude that any error here affected the defendant's substantial rights. See United States v. Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993) (concluding that prosecutor's misstatements in closing argument did not constitute plain error because they were, "in relation to the body of evidence received during trial, relatively insignificant").

**b. Misstatement of defendant's testimony about the Florida license**

The defendant argues that the prosecutor misstated his testimony when the prosecutor argued that the defendant "doesn't really remember who got him the [Florida] license or who gave it to him," calling into question the defendant's credibility. The defendant asserts that he testified in clear terms that he obtained his license from Nickoyan. However, the record supports the prosecutor's characterization of the defendant's testimony. When asked "Do you know who got this license for you?" Wallace replied, "No." While he testified that he gave his brother the photographs that were used to make the license, he stated that he "guess[ed]" that his brother "had a friend down there" but he had "no idea how that person went about getting this license." In light of this testimony, the prosecutor's statement was not improper.

**c. Misstatement of defendant's testimony about his brother's phone call**

In his closing argument, the prosecutor implied that the jury should be skeptical of the defendant's testimony about his phone conversation with his brother Nickoyan the night Nickoyan was arrested. The prosecutor noted that, "in the middle of the night on October 5th, the most urgent call you could possibly imagine, three o' clock in the morning he calls him, 'The police are surrounding my building. What should I do?' He testifies that – you know, they didn't really talk about that. They went on to

-19-

other, I guess, more pressing things." The defendant argues that the prosecutor misstated his testimony about his brother's phone call. Wallace argues that he testified that he had no idea where his brother called from and that he refused to adopt the prosecutor's characterization of the conversation as one in which his brother said there were cops surrounding his building.

We find no error here. The record demonstrates that when asked what he spoke to his brother about, if not Nickoyan's impending arrest, Wallace stated "I can't recall. I mean, what I remember it was very brief." Wallace stated that he remembered Nickoyan telling him that he (Nickoyan) was in trouble, but Wallace asserted that Nickoyan did not tell him the nature of this trouble, or, as far as Wallace could remember, anything about the police surrounding the building. Thus, the prosecution's characterization of Wallace's testimony was not plainly erroneous.

**d.  Reference to the TEC-9 recovered from the apartment as the TEC-9 possessed by the second man in the robbery**

The defendant argues that the prosecutor erred by repeatedly referring to the TEC-9 admitted into evidence (taken from the 181 Pleasant Street apartment) as the TEC-9 used in the robbery. He argues that the gun in evidence had no particular characteristics to distinguish it from any other TEC-9 and could not be connected by the prosecution to the TEC-9 used in the robbery.

-20-

We find no error here, plain or otherwise. There was ample evidence to support the government's argument that the TEC-9 recovered from the apartment was the same TEC-9 used in the robbery. DiBiasio, a firearms dealer with 40 years of experience, testified that the gun pointed at his face was a particular vintage of the TEC-9 semi-automatic and that it matched the gun recovered from the apartment. In addition, the TEC-9 recovered from the apartment was found there with five of the six stolen handguns from the robbery. This evidence is enough to support the government's argument.[4]

### 3. Airline reservation evidence

At trial, Wallace objected to the evidence of an airline flight reservation as irrelevant under Fed. R. Evid. 401 and 402.[5] On appeal, he also contends that the evidence was unfairly

---

[4] Wallace also argues that the totality of the errors that he alleged in the cross-examination and the closing argument constitutes clear and obvious error. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st. Cir. 1993) ("[I]ndividual errors insufficient of themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."). Because we have concluded that there has been no error, his totality-of-errors argument also fails.

[5] Fed. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 402 states in part that "[e]vidence which is not relevant is not admissible."

prejudicial under Fed. R. Evid. 403.[6]  We review the preserved Fed. R. Evid. 401 and 402 objection for abuse of discretion.  See United States v. Richardson, 421 F.3d 17, 37 (1st Cir. 2005).  We review the unpreserved Fed. R. Evid. 403 objection for plain error.  See United States v. Cotto-Aponte, 30 F.3d 4, 6 n.1 (1st Cir. 1994).

The district court admitted evidence of a Southwest Airlines reservation made on August 28, 2000 for a roundtrip flight on August 30, 2000 from Providence, Rhode Island, to Phoenix, Arizona, scheduled for return on September 20, 2000, in the names of Devon Lewis and James Coleman.[7]  The flights were never taken and there was no evidence as to who made the reservation.

Wallace argues that the evidence should have been excluded as irrelevant because "there was no foundation linking him to that reservation."  On the contrary, there was ample foundation linking Wallace to the reservations.  The flight reservation was made in his alias and in the name of a man whom Wallace asserts is his cousin.  Furthermore, Wallace admitted in his testimony that it was "possible" that he made a flight reservation to Arizona in this time period.  Thus, the flight reservation was adequately linked to Wallace.  As the government argues, the flight reservation,

_____

[6] Fed. R. Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[7] According to the defendant, James Coleman is one of his cousins.

although never used, had some relevance towards undermining Wallace's claim that he had permanently relocated to Arizona at some point prior to the date of the reservation. The district court did not abuse its discretion in admitting this evidence over the defendant's Fed. R. Evid. 401 and 402 objection.

On appeal, the defendant also argues that the evidence should have been excluded under Fed. R. Evid. 403 because its probative value, if any, was outweighed by its unfairly prejudicial impact. He argues that "[i]ts only possible use could have been to improperly undermine defendant's contention that he was in Arizona from July 2000 through October 2000." The government argues that there was nothing unfair about asking the jury to draw this inference against the defendant's alibi. We agree. In any event, there was no plain error under Fed. R. Evid. 403 in admitting this evidence.

### 4. Jury Instructions

The defendant challenges the district court's jury instructions on the elements of the § 924(c) count, when flight can constitute evidence of consciousness of guilt, and reasonable doubt. Wallace did not object to any aspect of the jury instructions at trial. We therefore review his claims for plain error. See United States v. Sabetta, 373 F.3d 75, 80 (1st Cir. 2004).

### a. Elements of the § 924(c) count

Under 18 U.S.C. § 924(c)(1)(a)(ii),

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime -- . . . if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.

The district court quoted the full text of the statute, and then described each element of the offense separately. One of the elements is that the defendant used or brandished a real firearm, not a toy or replica. See United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993). The court cautioned the jury that the government was required to prove that the gun allegedly brandished was a real gun. The court then stated that "the actual firearm or firearms allegedly brandished by the defendant need not be introduced, but they have been, in order for the defendant to be guilty of the charge as long as you find beyond a reasonable doubt [that] the defendant had a real gun on September 25, 2000."

Wallace argues that the district court essentially told the jury that the government introduced the actual firearm allegedly brandished by the defendant -- despite the defendant's vigorous challenge to whether the gun produced by the government was the same gun allegedly used in the robbery. The government argues that the court used the term "allegedly brandished" and,

-24-

thus, "[i]t was still up to the jury to decide (a) whether Timi had in fact brandished a gun in the store and (b) whether the gun that he brandished was the one that had been introduced in evidence."

We agree with the defendant that the language used in this instruction is somewhat ambiguous. The judge's choice of words may have inadvertently lent credence to the prosecutor's argument that the gun found in the defendant's apartment was the same gun (not just the same model of gun) used in the robbery. However, even assuming there was some error here, we cannot conclude that any such error was "clear" or "obvious." The likelihood of jury confusion was mitigated by the judge's clear instructions on the text of the actual statute and the fact that the written instructions provided to the jury omitted the contested language. Furthermore, as we have already noted, there was ample evidence that the gun introduced at trial and the gun used in the store were the same. It is therefore unlikely that any ambiguity in this part of the court's instructions affected the defendant's substantial rights or the integrity of the trial.

### b. Flight as evidence of consciousness of guilt

The defendant argues that the court should not have given an instruction on when flight can constitute evidence of a defendant's consciousness of guilt. He does not challenge the actual language of the instruction, but contends that there was insufficient evidence to warrant any instruction concerning

consciousness of guilt in this case.  He reiterates the same arguments he raised in his challenge to the prosecutor's reference to his flight in the closing argument.  As we concluded, <u>supra</u> Part II.A.2.a, there was sufficient evidence in the record to support an inference of consciousness of guilt from his flight in this case.  Moreover, as we also previously discussed, the court carefully instructed the jury that flight did not necessarily reflect a guilty conscience and that the jury "should consider that there may be reasons for Timi Wallace's actions that are fully consistent with innocence."  In light of the evidence and the court's careful instructions, we find no error here.

### c.  Reasonable doubt

The court instructed the jury:

The Government must prove facts sufficient to prove all the elements of the offenses with which the defendant is charged as I have explained.  Now, the Government's obligation to prove the defendant's guilt beyond a reasonable doubt does not mean that it must do so beyond all doubt or beyond any conceivable shadow of a doubt. What it means is that the Government must prove the defendant's guilt by a reasonable doubt.

I cannot provide you with the definition of reasonable doubt.  You know what 'reasonable' means and you know what 'a doubt' means. Therefore it is up to you to decide whether the Government has proved the defendant guilty beyond a reasonable doubt.

The defendant argues that the latter portion of this instruction, i.e., the court's statement that it could not provide the jury with

-26-

the definition of reasonable doubt, in combination with its earlier statement focusing on what the government does _not_ have to prove, demonstrated "a lack of balance [] that shifted the focus from the government's affirmative burden to what the government need not prove and effectively diminished the standard of proof beyond a reasonable doubt."

We have previously explained that "reasonable doubt does not require definition." United States v. Rodriguez-Cardona, 924 F.2d 1148, 1160 (1st Cir. 1991). We have also upheld instructions on reasonable doubt that have explained what it does _not_ mean:

> By itself, the concept of proof "beyond a reasonable doubt" gives the defendant a substantial advantage, which is why defense counsel so often repeat those words in summation. Although the advantage is a legitimate one, it does not seem to us one that is likely to be undermined by an instruction that with a few general phrases indicates that not every doubt is a reasonable one.

United States v. Whiting, 28 F.3d 1296, 1303-04 (1st Cir. 1994).

Considering the district court's instructions as a whole, we are confident that it did not, as the defendant argues, diminish the government's standard of proof. Early in the instructions, the court stated clearly:

> In order for the Government to prove the defendant guilty of an offense, it must convince you beyond a reasonable doubt that it has proven each and every element of the offense. Possibilities or even probabilities are not sufficient. If the Government fails to prove any one or more elements of an

-27-

> offense beyond a reasonable doubt, you must find the defendant not guilty of that particular offense.

All told, the court mentioned the government's duty to prove the elements of the offenses "beyond a reasonable doubt" nearly two-dozen times.  Thus, we find no error here.

## B. Sentencing

Wallace raises two sets of arguments challenging the sentence imposed by the district court.  First, he argues that the sentence was based on error in the district court's application of the advisory guidelines, both in terms of the court's calculation of the advisory guidelines range and its application of guidelines provisions to depart upwardly from that range.  Second, he argues that the sentence is unreasonable because it is substantially greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).[8]

---

[8] In summary, these factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established by the Guidelines;
(5) any pertinent policy statement;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

The district court sentenced Wallace shortly after Booker was decided, without the benefit of subsequent developments in our case law on the application of Booker. See United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) (en banc); United States v. Scherrer, 444 F.3d 91 (1st Cir. 2006) (en banc). The district court explained that it would begin by "consult[ing] the guidelines and [taking] them into account in sentencing," and then examining whether the advisory guidelines range "yield[s] a sentence that is sufficient . . . to meet the objectives of the Sentencing Reform Act at § 3553(a)." In carrying out this approach, the district court first noted that the PSR had reached a guidelines range based on an adjusted offense level of 29 and a Criminal History Category I. Then, without completing the guidelines analysis by determining whether an upward departure under the guidelines was appropriate, the court explained why it believed that the top of the PSR's recommended guidelines range did not yield a sentence that was sufficient to meet the objectives of 18 U.S.C. § 3553(a).

After its thoughtful and careful discussion of the factors in 18 U.S.C. § 3553(a), the district court returned to the guidelines and described several grounds for departure, not

(7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a).

-29-

discussed in the PSR, that the court thought were applicable in this case.  Using these grounds for departure, the court calculated a higher adjusted offense level and criminal history category than was calculated in the PSR.  Only then, after it had gone through its upward departure analysis, did the court announce its sentence -- 216 months for Counts I and II (double the high end of the guidelines range recommended in the PSR for these counts), 120 months for Count III to be served concurrently with Counts I and II, and 84 months for Count IV to be served consecutively with Counts I-III.  The court then reiterated that it reached the higher sentence for Counts I and II by applying the departure provisions in the guidelines:

> So that the record is clear, the way in which I am arriving at the departure, if you call it that, variance, of 216 months is by an adjustment of the offense level in this case for the reasons that I set forth, departure grounds that I set forth[,] from a 29 to an offense level 34.  That is a five-level adjustment on offense level.  And an adjustment of the criminal history category to a criminal history category of three given the inadequacy of category one for purposes of assessing the defendant's actual criminal history and the reasons for that I have set forth.

The district court explained that it "use[d] the departure framework as a gauge or a measure of the reasonableness of the sentence to be imposed."[9]

---

[9] Although <u>Booker</u> used the term "reasonableness" in discussing sentencing in the advisory guidelines scheme, we emphasize that

The district court's approach to the sentence here is not the approach that we have adopted in this circuit post-<u>Booker</u>:

> Although the guidelines have become advisory rather than mandatory, determining the correct GSR [guidelines sentencing range] remains an appropriate starting point for constructing a defendant's sentence. Once the sentencing court has established the GSR <u>(including a consideration of any applicable departures)</u>, it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations. Finally, it must determine, in light of that assessment, whether a sentence above, within, or below the GSR is warranted. The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing.

<u>United States</u> v. <u>Dixon</u>, 449 F.3d 194, 203-04 (1st Cir. 2006) (emphasis added and citations omitted); <u>see</u> <u>also</u> <u>Jimenez-Beltre</u>, 440 F.3d at 518-19. Only after the district court has conducted the advisory guidelines analysis, <u>including</u> a determination of the appropriateness of downward or upward departures under the guidelines, should the court then decide whether the guidelines sentence comports with the sentencing factors set forth in 18 U.S.C. § 3553(a). Here, the district court did not complete the guidelines analysis before evaluating the § 3553(a) factors.

---

"reasonableness" is the standard used to review a sentence on appeal, not the governing factor for the district court when determining a sentence in a particular case. <u>See</u> <u>Jimenez-Beltre</u>, 440 F.3d at 519 (explaining that we review a district court's sentence for "reasonableness," i.e., "a plausible explanation and a defensible overall result").

Instead, it turned to those statutory factors before doing the upward departure guidelines analysis.

The government argues that we should review the district court's sentence solely for reasonableness under the § 3553 factors, arguing that "the fact that the court later made the additional observation that, in effect, it had increased the offense level from 29 to 34 and the [Criminal History Category] from I to III, does not mean that [the defendant] received a conventional, pre-Booker, upward departure [analysis]." We might agree with the government's focus on the reasonableness of the sentence, irrespective of the district court's error in the sequence of its analysis, if the government was correct that the defendant had not received a "conventional, pre-Booker upward departure [analysis]." Yet the district court unmistakably explained that it reached the 25-year sentence by applying a departure analysis, stating that "the way at which I am arriving at the departure, if you call it that, variance, of 216 months is by an adjustment of the offense level in this case for the . . . departure grounds that I set forth[.]" As we have noted, the court began the sentencing hearing with the initial guidelines range recommended in the PSR, which incorporated certain sentencing enhancements. The court then considered whether a sentence at the top of that range was consistent with the sentencing factors set forth in 18 U.S.C.§ 3553. It did not, at that point, decide what

sentence would be consistent with those factors.  To arrive at the specific sentence, the court returned to the guidelines, stating, "And as I indicated early on, I would use the departure framework as a gauge or measure of the reasonableness of the sentence to be imposed."  Only after conducting an upward departure analysis did the court arrive at the specific sentence it imposed.

Because the district court relied on an upward departure guidelines analysis in reaching the sentence it imposed on Wallace, we are required to review this analysis for error under the guidelines (to the extent that Wallace raised such claims).  See United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005) (explaining that, post-Booker, "so far as the Guidelines bear upon the sentence imposed, the court's calculation must be correct, subject of course to the limitations of plain error or harmless error review").  Thus, we must address all of the defendant's claims of legal errors in sentencing before we consider whether the sentence as a whole is reasonable.  We review claims of legal errors in sentencing, including errors in the interpretation of guidelines provisions, de novo.  See United States v. Rivera, 448 F.3d 82, 84 (1st Cir. 2006); Robinson, 433 F.3d at 35.  We review the district court's factual findings for clear error.  See Robinson, 433 F.3d at 38.  However, because the defendant properly preserved only one of his claims of error (the application of the physical restraint enhancement), we review his other, unpreserved

claims of error in the guidelines analysis for plain error only. See <u>Rivera</u>, 448 F.3d at 86.

### a. Claims of error in the PSR's recommended advisory guidelines range

The defendant raises two claims of error in the PSR's recommended advisory guidelines range, which the district court accepted and used as its starting point during sentencing. First, the defendant argues that the district court erred in applying a two-level enhancement for physical restraint of a victim in its calculation under U.S.S.G. § 2B3.1(b)(4)(B) (robbery) and § 3A1.3 (unlawful possession of a firearm). Second, he argues that the district court erred in applying a three-level enhancement for the number of firearms involved in the offense under U.S.S.G. § 2K.2(b)(1). We address each claim in turn.

### i. Enhancement for physical restraint of victim

The sentencing allegations in the indictment charged that the defendant and his brother Nickoyan "physically restrained" DiBiasio and Gallinelli, meriting a two-level enhancement under U.S.S.G. § 2B3.1(b)(4)(B). This enhancement applies "if any person was physically restrained to facilitate commission of the offense or to facilitate escape" during the course of a robbery. U.S.S.G. § 2B3.1(b)(4)(B). Section 3A1.3 also permits a two-level enhancement "if a victim was physically restrained" during the course of any offense. The jury found beyond a reasonable doubt that the victims were physically restrained during the robbery.

-34-

The PSR recommended the two-level enhancement.  Wallace objected.  Applying the advisory guidelines, the district court applied the enhancement.

Wallace argues that his conduct, and the conduct of Nickoyan, did not constitute physical restraint of the victims because they did not physically touch the victims or force them into a separate and confined space.  The government argues that the enhancement was appropriate because Wallace and Nickoyan rendered the victims physically immobile by keeping their guns pointed directly at each victim in close range, repeatedly telling them not to move, and because Nickoyan placed his body in the path of Gallinelli as she tried to flee the store, blocking her escape.  These actions, the government contends, are sufficient to justify the enhancement.

"Physically restrained" is defined in the Sentencing Guidelines Manual as "the forcible restraint of the victim such as by being tied, bound, or locked up."  U.S.S.G. § 1B1.1, cmt. n.1(i) (1998); see also U.S.S.G. § 2B3.1, cmt.(background) ( "The guidelines provides an enhancement for robberies where a victim . . . was physically restrained by being tied, bound, or locked up.").  We have observed that "[t]he examples listed in the guideline definition of 'physically restrained' are merely illustrative, . . . not exhaustive." United States v. DeLuca, 137 F.3d 24, 39 (1st Cir. 1998).  In DeLuca, we affirmed the

application of the "physical restraint" enhancement against the defendant because one of the defendant's co-conspirators "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]. Thus, these physical restrictions on [the victim]'s freedom of movement constituted 'physical restraint.'" Id.

Other circuits have cautioned against an overly broad reading of the term "physical restraint". See United States v. Parker, 241 F.3d 1114, 1118-1119 (9th Cir. 2001) ("[C]ases holding that a defendant physically restrained his victims usually involve a sustained focus on the restrained person that lasts long enough for the robber to direct the victim into a room or order the victim to walk somewhere. It is therefore likely that Congress meant for something more than briefly pointing a gun at a victim and commanding her once to get down to constitute physical restraint, given that nearly all armed bank robberies will presumably involve such acts."(internal citations omitted)); United States v. Drew, 200 F.3d 871, 880 (D.C. Cir. 2000) ("The required restraint must, as the language plainly recites, be physical. While [the victim of the attempted murder in this case] no doubt felt restrained by [the defendant], she was not subject to physical restraint, as we interpret the Guideline's use of that phrase. Any other interpretation would effectively add the two-level adjustment to

almost any attempted murder because presumably any victim would feel restrained if directed to move at gunpoint." (internal quotation marks and citation omitted)); United States v. Anglin, 169 F.3d 154, 164 (2d Cir. 1999) (concluding that "displaying a gun and telling people to get down and not move, without more, is insufficient to trigger the 'physical restraint' enhancement" in sentencing for armed robbery).

Some courts have found that holding someone at gunpoint during the commission of an offense, without physical contact or moving the victim into a separate, confined space, can constitute "physical restraint." See United States v. Wilson, 198 F.3d 467, 472 (4th Cir. 1999) ("A gun was held to [the carjacking victim's] head, and she was prevented from leaving her car, albeit briefly, until [the defendants] were able to get her money and gain control of her car. Under these circumstances, unquestionably, [the victim] was physically restrained to facilitate the commission of the carjacking."); United States v. Fisher, 132 F.3d 1327, 1329-30 (10th Cir. 1997) ("Physical restraint is not limited to physical touching of the victim. Rather, physical restraint occurs whenever a victim is specifically prevented at gunpoint from moving, thereby facilitating the crime. Keeping someone from doing something is inherent within the concept of restraint, and in this case one coconspirator deliberately kept the security guard at bay by

pointing a gun directly at his head while two others looted the teller counter." (internal citations omitted)).

In this case, while there was no physical contact between the defendant and the victims, the facts demonstrate that the defendant and his co-conspirator "physically restrained" the victims. Notably, the defendant's co-conspirator jumped in front of Gallinelli when she tried to escape, blocking her path and ordering her at gunpoint to stop. At the same time, the defendant kept his gun pointed directly at DiBiasio's face and chest, at close range, commanding him to look straight ahead into the gun and not to move. Given the intense, one-on-one nature of the armed robbery, the close proximity of the armed robbers to the victims, and the posturing of the defendant and co-conspirator when one of the victims tried to escape, there is no doubt that the victims were "physically restrained" for purposes of the guidelines enhancement.

### ii. Multiple weapons enhancement

The PSR recommended a three-level enhancement under U.S.S.G. § 2K2.1(b)(1)(C) because the offense involved a total of eight guns: the six guns stolen and the two guns that the defendant and his co-conspirator brandished during the robbery.[10] The

___

[10] The 1998 Sentencing Guidelines Manual, used in the PSR, provided for a three-level enhancement "[i]f the offense involved [8-12] firearms." U.S.S.G. § 2K2.1(b)(1)(C) (1998). Under the current guidelines, the unlawful receipt, possession, or transportation of a firearm yields a four-level enhancement if the offense involved

defendant objected to the proposed enhancement on the basis that "there was no evidence that the 2 items the robbers possessed during the robbery were in fact firearms under application note 1 of 2K2.1." The district court rejected this reasoning, recounting the victims' testimony at trial regarding the weapons used in the robbery. On appeal, the defendant abandons his previous argument and raises a different claim, arguing that there was insufficient proof that the firearm used in the robbery was "unlawfully possessed" for the purposes of U.S.S.G. § 2K2.1(b)(1)(C).[11]

An application note to U.S.S.G. § 2K2.1(b)(1)(C) explains that "[f]or purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed . . . ." The defendant argues that since he had no prior felony convictions, he did not unlawfully possess the gun under 18 U.S.C. § 922(g)(1) (prohibiting individuals with felony convictions from possessing a firearm). However, as the government points out, the defendant was prohibited from possessing a firearm under 18 U.S.C. § 922(g)(1) (prohibiting a "fugitive from justice" from possessing a firearm) and § 922(g)(3) (prohibiting an

---

8-24 firearms. U.S.S.G. § 2K2.1(b)(1)(B)(2006).

[11] The defendant argues that this new argument was preserved by his original objection. Because that objection was on different grounds, however, we deem the defendant's present argument of error, raised for the first time on appeal, as unpreserved. See United States v. Figuereo, 404 F.3d 537, 540 & n.3 (1st Cir. 2005).

"unlawful user of or addicted to any controlled substance" from possessing a firearm).  The defendant offers no argument as to why his possession of a firearm would not be unlawful under these provisions.  The defendant was a fugitive from justice and, according to the PSR, he admitted to regularly using marijuana.  We therefore find no plain error in the application of this sentencing enhancement.

### b. Grounds for upward departure

In this case, the district court's upward departure under the advisory guidelines involved a five-level increase in the adjusted offense level and an increase in the criminal history category from I to III.  See United States v. Figaro, 935 F.2d 4, 8-9 (1st Cir. 1991) (noting that, "in an appropriate case," an overall departure under the guidelines may be based on an increase in the offense level and in the criminal history category).  The defendant argues that the district court erred in applying this upward departure because none of the six grounds for departure were applicable in his case.  We conclude that two of the grounds relied upon by the district court were applied appropriately and four were not.

### i. Valid grounds for departure

#### (1) Weapons and dangerous instrumentalities

Under U.S.S.G. § 5K2.6,

[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.

The district court applied this upward departure, noting that "[i]n this case, high-powered weaponry was used, a pre-banned semi-automatic or machine-gun-like weapon [was] pointed directly into the face of the victims."

The defendant argues that the application of this upward departure amounts to impermissible double-counting because the dangerous nature of the TEC-9 firearm used in the robbery was already accounted for in the calculation of the base offense level under U.S.S.G. § 2K2.1(a)(4)(B) (unlawful possession of semiautomatic weapon). We reject this argument. "Sentencing factors do not come in hermetically sealed packages, neatly wrapped and segregated one from another. Rather, several factors may draw upon the same nucleus of operative facts while nonetheless responding to discrete concerns. Consequently, a degree of relatedness, without more, does not comprise double counting."

United States v. Lilly 13 F.3d 15, 19 (1st Cir. 1994). While §
2K2.1 accounts for Wallace's unlawful possession of the TEC-9, §
5K2.6 accounts for the fact that Wallace used the weapon in a way
that endangered his victims. See United States v. Hardy 99 F.3d
1242, 1249-50 (1st Cir. 1996) ("[T]o the extent a sentencing court
supportably finds that a defendant's choice of weapons, and the
actual manner of its use, increased the danger to 'unusual' levels,
an upward departure under U.S.S.G. § 5K2.6 would be permissible.").

As the district court noted during sentencing, the
defendant pointed a semi-automatic weapon directly into the face of
DiBiasio at a close range while his co-conspirator pointed his
weapon at Gallinelli. This action presents a danger not accounted
for by the defendant's possession of the TEC-9 alone. Thus, on the
facts here, the harm underlying the calculation of the base offense
level under § 2K2.1 and the harm underlying the application of the
upward departure under § 5K2.6 are different. We therefore
conclude that the defendant's use of weapons and dangerous
instrumentalities, as the district court found, was a valid ground
for departure in this case.

### (2) Disruption of a government function

Under U.S.S.G. § 5K2.7, "[i]f the defendant's conduct
resulted in a significant disruption of a governmental function,
the court may increase the sentence above the authorized guideline
range to reflect the nature and extent of the disruption and the

importance of the governmental function affected."  In applying this ground for departure, the district court made three findings related to the consequences of Wallace's evasion of arrest and prosecution in this case.  First, it noted that Wallace's flight from justice "caused the marshal service to engage in substantial investigative and law enforcement activity in a four-year long search for him."  Second, the court stated that the defendant's actions "cause[d] there to be two trials of this matter instead of one.  He would have likely been tried with his co-defendant, his brother . . ."  Third, and relatedly, Wallace's actions "forced victims in this case to testify a second time and to relive the terror that they were subjected to a second time."

The defendant argues that there "was no indication that the government expended significant resources in searching for the defendant.  Nor was there a demonstration that a joint trial would have taken place or evidence that the costs of a separate trial for defendant were such as to warrant" the upward departure.  We reject the defendant's argument that the district court's findings were insufficient to support the application of the departure in this case.  As the district court noted, the defendant had evaded arrest for four years, leading to a trial that took place years after the trial of his co-conspirator.  We have previously noted that, in a multi-defendant case, a defendant's flight from justice can disrupt government functions:

-43-

> In addition to the possible disappearance of witnesses and the loss of evidence, the defendant may obtain a distinct advantage over the government by absconding in a multi-defendant case. If the government proceeds against the co-defendants before the defendant is found, the defendant can assess the strengths and weaknesses of the government's case before returning for his own trial. Moreover, the defendant could create additional impediments to the government's ability to prosecute the co-defendants. The co-defendants could attempt to shift the blame from themselves to the absent defendant. Further, the defendant may place additional burdens on the court because, in many cases, the court will either have to conduct multiple trials unnecessarily, or wait an indeterminate length for the capture of the defendant to conduct a single trial.

United States v. Moreno, 367 F.3d 1, 4 (1st Cir. 2004) (internal citations omitted). In addition, we have noted that a long absence can provide further support for a § 5K2.7 departure:

> [T]he length of the absence can be relevant to determining the extent to which the defendant's conduct disrupted the judicial process. The longer the absence, the more likely it is that the government will have difficulty prosecuting the defendant on his return. In addition by absenting himself, the defendant (if convicted) delays the day on which he will ultimately face punishment.

Id. At the very least, the government in this case had no choice but to conduct another trial, preparing witnesses it had already prepared years earlier at Nickoyan's trial, in order to obtain a conviction of the defendant. Thus, a factual basis for this departure exists in the record. Moreover, there is no concern that applying a departure here leads to any impermissible double-

-44-

counting.  The adjusted offense level does not otherwise account for Wallace's flight from justice.  <u>Cf.</u> <u>Moreno</u> 367 F.3d at 3-5 (noting that grounds for departure under § 5K2.7 were already accounted for in offense level for defendant's bail jumping).  The defendant does not convince us that this ground for departure is invalid.

### ii.  Invalid grounds for departure

### (1) Obstruction of justice

The PSR recommended a two-level enhancement for obstruction of justice based on the defendant's perjury at trial.  During sentencing, the district court explained that an upward departure beyond the two-level enhancement was appropriate:

> That enhancement takes into account only the perjurious testimony of the defendant at trial.  It does not account for the fact that he was a fugitive from justice for over four years.  It does not account for the fact that the defendant provided false information to the Court . . . .  In this case, the defendant has not only perjured himself at trial but provided false information to the Court and provided false information to the Office of Probation.  And as I said, in addition to that, he was a fugitive from justice.  So in my view, the obstruction enhancement contained in the presentence report does not adequately reflect the degree and number of occurrences of obstructed behavior engaged in by this defendant so an enhancement beyond the two points contained in the presentence report would be appropriate.

The defendant argues that an upward departure from the two-level obstruction of justice enhancement was not appropriate because (a)

flight from arrest without engaging in reckless endangerment is classified in the guidelines as the type of conduct not ordinarily warranting an obstruction of justice adjustment and (b) the court offered no factual predicate for its conclusions that the defendant provided false information to the court and the probation office beyond the testimony viewed as perjurious.[12]

The guidelines provide for a two-level enhancement for obstruction of justice if

> the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1. The advisory guidelines further permit a district court to depart upwardly for a factor already taken into consideration in a specific enhancement under certain circumstances:

> A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of . . . that

---

[12] In his appeal, the defendant does not challenge the district court's application of the two-level enhancement for obstruction of justice as recommended by the PSR. His challenge is limited to the court's upward departure from that two-level enhancement.

-46-

which ordinarily is involved in that kind of
offense.

U.S.S.G. § 5K2.0(a)(3).  In this case, the court identified two main reasons for upwardly departing on grounds of obstruction of justice: (1) the defendant's flight from justice and (2) his extensive perjury, beyond perjury at trial.

We agree with the defendant that it was not appropriate for the court to justify its departure from the two-level obstruction of justice enhancement based on the defendant's flight from justice.  The commentary to the obstruction of justice enhancements lists "avoiding or fleeing from arrest" (where reckless endangerment was not involved) as a type of conduct which "ordinarily do[es] not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments [e.g., Acceptance of Responsibility] apply." U.S.S.G. § 3C1.1, cmt. n. 5(d) (emphasis added); see also United States v. Gibson, 409 F.3d 325, 341 (6th Cir. 2005) (noting limitations on applicability of obstruction of justice enhancement).  The court should have taken this commentary into account when considering whether to apply this departure provision. Cf. United States v. Zapete-Garcia, 447 F.3d 57, 60-61 (1st Cir. 2006) (noting that, although the guidelines are not binding, "[a] policy statement [in the guidelines] . . . must be duly considered by the district judge").

-47-

We also agree with the defendant that there was not an adequate factual predicate, as far as we can discern from the record, for the court's finding at sentencing that the defendant provided false information to the court and the probation office beyond the perjurious testimony he provided at trial. Such a finding, if factually supported, would have been relevant to the obstruction of justice analysis, and thus whether an upward departure was justified. See U.S.S.G. § 3C1.1, cmt. n.4 (b), (f), & (h) (citing, as examples of conduct typically considered to be obstruction of justice, "providing materially false information to a judge or magistrate" and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court"). However, the district court never explained what materially false information Wallace provided to the probation office or to the court beyond his trial testimony, and we find nothing apparent from the PSR or other parts of the record in this case. Without any explanation from the district court, we conclude that an upward departure from the two-level enhancement already applicable due to Wallace's perjury at trial was not justified.

### (2) Extreme psychological injury

Under U.S.S.G. § 5K2.3,

> [i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence

above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.

Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

The district court described how "the defendants, particularly this defendant, terrorized their victims." Reciting at length testimony from DiBiasio and Gallinelli, the district noted that the victims thought they were going to die and never see their families again. As DiBiasio testified, he had to stare into the gun pointed at his head, thinking that he would be killed because he could identify the defendant, face unhidden, pointing the gun at him.

The defendant argues that, while the victims were no doubt terrified at the time of the robbery, there was no evidence that they suffered the kind of "substantial impairment" that ordinarily justifies the application of this departure provision. We agree with the defendant that the district court's finding here was clearly erroneous. The district court pointed to no evidence of the victims' "physical or psychological symptoms or [] changes

in behavior patterns" or the "extended or continuous duration" of any such psychological injuries. U.S.S.G. § 5K2.3. There was some testimony at trial regarding the understandable trauma experienced by the victims, but the vast majority of that testimony relates to how the victims felt at the time of the robbery. The only statement regarding the long-term after-effects of robbery was made by DiBiasio, when he stated that he still "dream[s] about [the defendant's] face." Other references in the testimony were made to the fear and emotional state of Gallinelli and the store clerk who hid in the basement, but those statements apparently refer to the trauma they experienced at the time of, or in the days immediately after, the robbery.

We do not in any way minimize the terror that the victims felt or the real possibility that this traumatic event might have longstanding psychological consequences for them. However, to support the departure ground invoked by the court, there must be evidence of such consequences in the record. The witnesses did not testify about their sustained psychological injury at trial. No medical or psychiatric records were presented. According to the PSR, no victim impact statement appears to have been submitted by any of the victims.

Robbery has a relatively high base offense level, reflecting the serious nature of the offense. See U.S.S.G. § 2B3.1, cmt. (background). While there is evidence that this

armed robbery was more terrifying and more personal than typical armed robberies, there is insufficient evidence of sustained psychological injuries suffered by the victims. Without that evidence, there is no basis for concluding these victims' injuries, whatever they may be, are significantly worse than the injuries suffered by victims in the majority of armed robbery cases. Cf. United States v. Pelkey 29 F.3d 11, 16 (1st Cir. 1994) (holding that fraud victims' testimony about their "feelings of lack of trust, frustration, shock, and depression" was "altogether insufficient to permit departure for psychological injury" because "the injuries these people suffered were no worse than that of many fraud victims"). Given the lack of evidence, this was an invalid ground for departure in this case.

### (3) Facilitation of criminal purpose

Under U.S.S.G. § 5K2.9, "[i]f the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct." In applying this departure provision, the court noted two factors: (1) that "there is at least some passing reference to the involvement of the defendant and his brother with another brother and the involvement in other criminal activity" and (2) that "there can be no other purpose for stealing an arsenal of weapons than the facilitation of additional criminal activity. . .

. [s]o the stealing of an arsenal of weapons is by its nature designed to facilitate the commission of other crimes."

The defendant argues that there is no factual basis supporting the application of this departure provision here and that the district court erred by relying on speculation that this crime was designed to facilitate some other crimes. We agree. The focus of a criminal facilitation departure from a guidelines range is on the specific criminal activity being facilitated or concealed and the nexus between that criminal activity and the offense charged. See United States v. Hawkins, 901 F.2d 863, 866 (10th Cir. 1990). While "the sentencing guidelines permit the court to consider uncharged conduct related to the offense of conviction" in applying this departure provision, Figaro, 935 F.2d at 7, the specific criminal conduct relied upon here is unclear. A "passing reference" at trial to the fact that one of the stolen guns was found in the apartment of the defendant's brother Kamal does not establish that some other type of criminal activity was being facilitated or concealed by the robbery. And we cannot conclude that, in every conceivable factual scenario, the theft of multiple weapons is always designed to facilitate some other crime. Indeed, such a finding would be problematic here because the adjusted offense level for the underlying crime already accounts for the fact that a large number of guns were stolen. See U.S.S.G. § 2K2.1(b)(1)(C) (multiple weapons enhancement).

-52-

The district court needed to make a specific factual finding of the criminal conduct being facilitated in this case, and it did not do so. Without that finding, we cannot conclude that a proper nexus between the offense here and some other criminal conduct exists. See United States v. Ogbeide, 911 F.2d 793, 796 (D.C. Cir. 1990) (concluding that, in absence of an explanation of what "other offense" the sentencing court had in mind in upwardly departing under § 5K2.9, the sentencing court may have improperly relied on conduct already accounted for in the guidelines); see also Hawkins, 901 F.2d at 866 ("Without a demonstration of [] a nexus [between the charged offense and the other criminal conduct], there is no factual support for an upward departure under § 5K2.9."). Thus, this was an invalid ground for departure in this case.

### (4) Criminal History Category

Under U.S.S.G. § 4A1.3(a), "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." The type of information that may support such an upward departure is "whether a defendant was pending trial or sentencing on another charge at the time of the instant offense." U.S.S.G. § 4A1.3(2)(D); see also id., cmt., n.2(A)(iv) ("An upward departure from the defendant's

-53-

criminal history category may be warranted based on . . . [c]ommission of the instant offense while on bail or pretrial release for another serious offense."). When a departure is appropriate, the sentencing court "shall determine the extent of a departure . . . by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." U.S.S.G. § 4A1.3(4)(A).

In this case, the PSR assigned zero criminal history points to Wallace because he had no prior criminal convictions, resulting in a criminal history category of I (applicable to defendants with 0-1 criminal history points). In upwardly departing from a criminal history category of I to a category of III (applicable to defendants with 4-6 criminal history points), the district court relied on the fact that the defendant committed the robbery while under indictment for murder. The defendant argues that the district court made no findings as to whether he was aware of the indictment at the time of the robbery, and thus there was no basis to depart upwardly. The defendant further argues that, assuming that the commission of a crime while under indictment for another crime was a proper basis for an upward departure in his case, remand is warranted because the district court offered no explanation for its conclusion that the facts in his case justified an upward departure to a criminal history

category of III, effectively adding 4-6 points to his criminal history points.

We have not previously addressed whether the commission of a crime while under indictment for another serious crime is an appropriate ground for upwardly departing from a defendant's criminal history category.  If the defendant knew that he was indicted for a certain crime, his commission of another offense while under that indictment is arguably indicative of his "likelihood to commit other crimes."  U.S.S.G. § 4A1.3(a).[13]  This situation is akin to the example listed in the guidelines of committing an "offense while on bail or pretrial release for another serious offense." U.S.S.G. § 4A1.3(2)(D), cmt., n.2(A)(iv). In both scenarios, no adjudication of guilt has occurred, but the defendant's commission of a crime during a period in which one would expect a careful abidance to the law arguably demonstrates his or her propensity for criminal behavior, at least for the purposes of sentencing.  In this case, the defendant is hard

---

[13] The government's argument that the indictment in and of itself is evidence of the defendant's criminal behavior is less persuasive.  Under the guidelines, a prior arrest record in and of itself may not be considered for the purposes of an upward departure on the criminal history category.  See U.S.S.G. § 4A1.3(3); see also Zapete-Garcia, 447 F.3d at 61 (noting that the guidelines "recognize[] th[e] limitation on the value of an arrest as information about a defendant's criminal propensity, highlighting the important distinction between direct evidence of past criminal behavior and mere arrests that may or may not have been the result of wrongdoing").  An indictment, like an arrest, would also not be direct and reliable evidence of past criminal behavior.

pressed to argue that he did not know that he was under indictment for murder at the time of the robbery, given his numerous arguments on appeal that his flight and use of aliases during that period of time might have been due to evading the murder charge.

It is a more difficult question whether the defendant's commission of this robbery while under indictment is a valid basis for finding that his criminal history category, or even the next higher criminal history category, "substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. Assuming that the facts do support an upward departure in criminal history category in general, we note that the district court here departed to a criminal history category of III -- a departure that, with a 34 adjusted offense level, shifted the guidelines range for Counts I and II from 155-188 months to 188-235 months. The court did not explain why such an increase was appropriate in this case. The upward departure essentially added 4-6 points to Wallace's criminal history points. Yet, under the guidelines, if a defendant had committed a robbery while under "any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status," only 2 points would have been added to his or her criminal history points. See U.S.S.G. § 4A1.1(d); see also U.S.S.G. § 4A1.3(4)(A) (explaining that the sentencing court "shall determine the extent

of a departure . . . by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's").  Without any explanation of why the court chose a departure of this extent, we cannot conclude that it was justified on the record here.  As we have explained,

> [a]lthough we accord substantial leeway to a sentencing court's determination of the appropriate degree of departure, this freedom does not relieve [it] from explaining its ultimate decision of how far to depart. Merely explaining why a departure was made does not fulfill the separate requirement of stating the reasons for imposing the particular sentence.

United States v. Pratt, 73 F.3d 450, 453-54 (1st Cir. 1996) (internal quotation marks and citations omitted) (remanding for further explanation why upward departure from Criminal History Category I to III was justified).  Thus, even assuming that some departure in criminal history category is justified here, "we are unable to evaluate responsibly the reasonableness of the extent of the court's departure absent explication, which we observe might include at least an indication of why a one category increase is inadequate" in this case.  Id. at 454.

**iii.  Whether remand for resentencing is merited based on errors in departure grounds**

After carefully reviewing the district court's application of the departure provisions in the advisory guidelines

in this case, we have concluded that it has articulated both valid and invalid grounds for its departure from an offense level 29, Criminal History Category I (resulting in an advisory guidelines range of 87-108 months), to an offense level 34, Criminal History Category III (resulting in an advisory guidelines range of 188-235 months). Specifically, we conclude that the district court validly relied on the use of weapons and dangerous instrumentalities and the disruption of a government function to upwardly depart from the initial guidelines range. However, we also conclude that the court improperly relied on grounds of obstruction of justice, extreme psychological injury, and facilitation of a criminal purpose to increase the offense level, and did not adequately explain its reasons for upwardly departing on the criminal history category from I to III.

In this case, we may only remand if the district court's decision to depart upwardly based on these valid and invalid grounds was plain error.[14] We have already identified the errors

---

[14] The defendant did not object to the district court's upward departure at sentencing. However, we note that the district court did not notify the parties of its intention to depart and the grounds for the departure. Under Fed. R. Crim. P. 32(h),

> [b]efore the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a

in the district court's departure analysis.  The question is whether the errors are plain, affected Wallace's substantial rights, and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Medina-Martinez, 396 F.3d at

---

departure.

Thus, there is cause to question whether it is appropriate to apply plain error review of the district court's upward departure given the lack of notice. See id.; see also United States v. Cortes-Claudio, 312 F.3d 17, 24 (1st Cir. 2002) ("Generally, when a party fails to contemporaneously object to an error in sentencing we review only for plain error.  We have recognized, however, in the context of sentencing, that a post-sentence objection is not necessarily required to preserve the issue for appeal if the defendant could not reasonably have anticipated the issue would arise until after the court ruled." (internal citations omitted)).  The defendant here had no reason to expect that the district court would rely on departure provisions not listed in the  PSR, and the government made no arguments that additional guidelines provisions applied.  On the contrary, the government attorney explicitly stated during sentencing that "the guidelines [as the PSR calculated the range] themselves account for much of the reprehensible nature of this defendant's conduct."

However, the defendant did not raise the issue of notice on appeal, and we have not previously decided whether and to what extent Fed. R. Crim. P. 32(h) applies in post-Booker cases. See U.S. v. Mateo, No. 05-1805, 2006 U.S. App. LEXIS 11396, *2-5 (1st. Cir. May 5, 2006) (unpublished) (discussing without deciding the application of Fed. R. Crim. P. 32(h) in post-Booker cases).  We do not have to decide that issue here because, even under plain error review, we conclude that a remand is necessary.  However, as this case illustrates, it is clearly the better practice -- whether or not the legal requirement survives Booker -- for the court to provide notice to defendants when relying on departure provisions in the advisory guidelines not previously identified in the PSR or in a party's pre-hearing submission.  We have found that several of the grounds for an upward departure were inappropriately applied here because of the lack of evidence in the record supporting them.  With notice from the court that such grounds for departure were to be considered, that problem might have been avoided.

8.  The defendant, of course, has the burden of establishing plain error.  <u>Id.</u>

First, we conclude that the errors are plain.  It is clear and obvious that a sentencing court must have sufficient evidence to support the application of a departure provision in the guidelines and must adequately explain its departure.  <u>See</u> <u>United States</u> v. <u>Cadavid</u> 192 F.3d 230, 238 (1st Cir. 1999) (noting the rule that grounds for departure must have adequate factual support in the record); <u>Pratt</u>, 73 F.3d at 453-54 (noting the rule that a sentencing court must adequately explain its decision to depart and its reasons for the extent of the departure).  Yet here the application of three of the six grounds of departure lacked factual support in the record, and the departure in a fourth ground, based on the defendant's criminal history, was not adequately explained.

Second, we find that the errors affected Wallace's substantial rights.  We have previously explicated the test for determining whether a departure based on both valid and invalid grounds has prejudiced the defendant:

> [A] departure which rests on a combination of valid and invalid grounds may be affirmed so long as (1) the direction and degree of the departure are reasonable in relation to the remaining (valid) ground, (2) excision of the improper ground does not obscure or defeat the expressed reasoning of the district court, and (3) the reviewing court is left, on the record as a whole, with the definite and firm conviction that removal of the inappropriate ground would not be likely to alter the

-60-

> district court's view of the sentence
> rightfully to be imposed.

United States v. Sanchez, 354 F.3d 70, 79 (1st Cir. 2004) (internal quotation marks and citations omitted). Following this analysis, we cannot conclude that the direction and degree of the departure -- an additional nine years, double the sentence recommended for Counts I and II in the PSR -- is reasonable in relation to the two remaining valid grounds for departure in this case. With four of the six grounds for departure excised, it seems self-evident that the expressed reasoning of the district court has been obscured. While we recognize the district court's careful explanation of why a high sentence was generally justified in this case, we believe that the court -- now knowing that four of the grounds upon which it expressly relied in determining the specific upward departure were invalid -- might (although by no means must) calculate a sentence upon remand different than the precise sentence it chose through its initial, erroneous departure analysis. We therefore lack the "definite and firm conviction" that removal of the inappropriate grounds would not be likely to alter the district court's view of the sentence rightfully to be imposed. See United States v. Diaz, 285 F.3d 92, 102 (1st Cir. 2002)(remanding where "two of three provisions on which the court based an upward departure were utilized improperly"); United States v. Diaz-Bastardo, 929 F.2d 798, 800 (1st Cir. 1991) (remanding where one of

the two grounds for departure was invalid, noting that, "[o]n this scumbled record, we do not believe that we should attempt to review the propriety and extent of a one-legged departure"). Wallace thus has established that the errors in the departure analysis affected his substantial rights.

Finally, we conclude that the last prong of the plain error test has been met as well. Having identified several legal errors, which were the pillars for a substantial increase in the sentence imposed, it would certainly "impair[] the fairness, integrity, or public reputation of the judicial proceedings" if we ignored them despite the absence of a firm conviction that the removal of the inappropriate grounds might not alter the sentence. Medina-Martinez, 396 F.3d at 8. The overall length of the sentence at stake, the difference between the sentence imposed and the one proposed in the PSR and by the government, and the fact that the defendant was not notified that the court was considering an upward departure on the grounds invoked by the court, see supra text at 58 n.14, provide further support for our conclusion.

Thus, we remand for resentencing. Because we remand based on errors in the application of the advisory guidelines, we do not reach the defendant's other argument that the sentence as a whole was substantially longer than necessary to meet the factors underlying 18 U.S.C. § 3553(a), hence unreasonable. We express no views as to the appropriate sentence on remand.

## III.

The defendant's conviction is affirmed, the sentence is vacated, and the case is remanded for resentencing.

So ordered.