# United States Court of Appeals
## For the First Circuit

Nos.  07-1010
      07-1011
      07-1012

UNITED STATES OF AMERICA,

Appellee,

v.

VAN ANH, a/k/a ANH VAN,
KHONG NGUYEN, and THINH CAO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Lynch, Circuit Judge,

John R. Gibson,[*] Senior Circuit Judge,

and Howard, Circuit Judge.

Inga S. Bernstein, for appellant, Anh Van.
John T. Ouderkirk, Jr., for appellant, Thinh Cao.
Alan Jay Black, for appellant, Khong Nguyen.
Donald C. Lockhart, Assistant United States Attorney, with
whom Robert Clark Corrente, United States Attorney, and Kenneth P.
Madden, Assistant United States Attorney, were on brief, for
appellee.

---

[*]Of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

April 11, 2008

**HOWARD**, <u>Circuit Judge</u>.  A jury convicted Anh Van,[1] Khong Nguyen, and Thinh Cao of multiple counts of conspiring to use or using extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894.  On appeal, the defendants challenge their convictions, their sentences, or both.  We affirm in all respects.

## I.  Background

We rehearse the background facts here, reserving the discussion of other facts for our later examination of defendants' challenges.  We view these facts in the light most favorable to the jury's verdict.  <u>United States</u> v. <u>Turner</u>, 501 F.3d 59, 63 (1st Cir. 2007).

Tommy Nguyen ("Tommy"), the victim, was a co-manager of a nail salon in Rhode Island.  In April 2005, he and a friend decided to gamble on a number of NBA basketball games, wagering a total of $12,000.  The men split the investment nearly evenly -- Tommy pledged $6,800 and his friend the remainder.  Tommy placed the bets through a middleman; the bookmaker was in Georgia.  Their predictions proved inaccurate and the $12,000 was lost.

Tommy soon received a phone call.  The caller was defendant Anh Van ("Van"), who ran the collection end of the gambling business.  Van informed Tommy that he would be stopping by

---

[1]  Although the government indicted Mr. Van as Van Anh, his true name is Anh Van.  We will refer to him as "Van" throughout the opinion.

Tommy's shop to have a talk. Minutes later, Van arrived at the salon with two men, one of whom was defendant Khong Nguyen ("Nguyen").

All four men proceeded to the parking lot. At this point, Van and Nguyen demanded the $12,000. Tommy explained that he needed more time and asked for an extension. Nguyen told Tommy that he had "come from far away" and that he "wanted the money." Ultimately, Van gave Tommy a few more days to get the money.

Throughout July, a series of "collection meetings" took place. Both Van and Nguyen attended the first four meetings; additional men accompanied them on three of the four. At each of the first three meetings, Tommy paid the men $2,000. He paid cash at the first two meetings, and at the third he had his co-manager at the salon, a woman named Yvonne, make out a check for $2,000 with the payee section left blank. At the fourth meeting he made out a check for $800 with the payee section left blank. At this point, Tommy had paid Van a total of $6,800 -- his share of the $12,000 debt.

Despite the payments already made, Van called Tommy and demanded the $5,200 balance. Tommy explained to Van that he had already paid his share and did not owe any more money. This logic failed to placate Van who told Tommy that he had to pay the remainder. When Tommy refused, Van told him that he could not "run nowhere" and that he, Van, would "send somebody down."

-4-

On the evening of July 25th, Tommy was working late at the nail salon. Tommy's co-manager Yvonne had left the salon temporarily but several customers and another employee named Tammy were present. When Tommy went outside to smoke a cigarette, he was confronted by Nguyen and two other men. The other men were Nguyen's brother, Quoc Nguyen ("Quoc"), and defendant Thinh Cao ("Cao"). Nguyen demanded the $5,200 balance. Tommy refused and retreated into the salon.

One hour later, Tommy emerged with Tammy. Again the men confronted him, preventing him from getting in his car. Yvonne had, by this point, returned to the shop and witnessed the confrontation. Nguyen told Tommy that he had "come down here to get the money" and that Tommy had "better pay him right now." Cao and Quoc also demanded the money. Tommy explained to the men that he had already paid Van. Cao then placed a call to Van and, when Van answered, gave the phone to Tommy. Over the phone Tommy again emphasized that he had already paid his share. Van remained unmoved. He told Tommy that he better pay the balance because "otherwise, you know, they [will] take care of you." Van then hung up. At this point, Cao instructed Nguyen and Quoc to "take care of him" and "go home."

The men attacked Tommy. Nguyen and Quoc knocked him to the ground and, as he covered his head, began kicking and punching him. As the men beat Tommy, Cao told Tommy that he should "just

-5-

pay the money." At some point, Yvonne tried to shield Tommy. Her intervention provided Tommy a window of escape and he fled. Although Nguyen and Quoc initially gave chase, Cao called them off, noting that Tommy "ha[d] a business [t]here" and "could not run anywhere." When Yvonne yelled that she was calling the police, the three men ran to their car and left the scene. As a result of the beating, Tommy suffered injuries to his neck, ribs, and legs.

Ultimately, police stopped the car in Massachusetts, arrested the three men, and returned them to Rhode Island authorities. A few weeks later, Tommy placed a recorded phone call to Van at the FBI's direction. When Tommy complained to Van about Van's behavior, Van stressed that he did not want to talk about "that matter" and warned Tommy repeatedly not to talk on the phone. The call ended with Van telling Tommy that they could meet in person to discuss the situation.

Cell phone records tied Van, Nguyen, and Cao to each other and to the beating. On December 7, 2005, a federal grand jury issued a two-count indictment against Van, Nguyen, Cao, and Quoc. The indictment alleged that the men either used or conspired to use extortionate means for the purpose of collecting an extension of credit in violation of 18 U.S.C. §§ 894 and 2.

The defendants, excluding Quoc, were tried together.[2] After a four-day trial, a jury convicted on all counts.

## II. Discussion

### A. Challenges to Conviction

Altogether, the defendants press six challenges to their convictions. The first four challenges concern the district court's (1) denial of Nguyen's motion for new counsel; (2) handling of the government's alleged discovery violation; (3) exclusion of certain evidence; and (4) denial of a mistrial motion. The defendants also challenge (5) the prosecutor's closing argument and (6) the district court's reasonable doubt instruction. We address each challenge in order.

### 1. Motion for New Counsel

Nguyen argues that the district court erred in denying his pro se motion for new counsel. We review a district court's decision to deny a defendant's motion for new counsel for an abuse of discretion. United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986).[3] Our review focuses on the following factors: (1) "the

---

[2] Although Quoc, Nguyen's brother, was indicted with the three defendants, he was tried separately.

[3] Nguyen's brief colors the issue before the district court as one concerning "counsel of choice." That is inaccurate. A case presents a "counsel of choice" issue if a court denies a defendant the right to "paid counsel of his choosing." United States v. Gonzalez-Lopez, 126 S. Ct. 2557, 2561 (2006) ("[A]n element of [the right to have the assistance of counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him . . . A defendant should be afforded a fair

-7-

timeliness of the motion"; (2) "the adequacy of the court's inquiry into the defendant's complaint"; and (3) "whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." Allen, 789 F.2d at 92. In considering these factors, we may bear in mind that "the right to counsel does not involve the right to a 'meaningful relationship' between an accused and his counsel." United States v. Machor, 879 F.2d 945, 952 (1st Cir. 1989) (citing Morris v. Slappy, 461 U.S. 1, 14 (1983)).

Nguyen's pro se motion was based on what he considered to be inadequate representation by his court-appointed counsel. When Nguyen filed the motion, his counsel had represented him for approximately four months. Initially, their relationship appeared to be satisfactory. Counsel filed several successful motions on Nguyen's behalf including motions to sever his case from that of his brother and to exclude certain evidence. Nguyen and his counsel also attended joint defense meetings with Van and his attorneys and discussed both the strength of the government's case and a proposed plea agreement.

---

opportunity to secure counsel of his own choice.") (emphasis added) (citation omitted); see also United States v. Gaffney, 469 F.3d 211, 215-16 (1st Cir. 2006). Nguyen was an indigent defendant. Although indigent defendants have the right to appointed counsel, Gideon v. Wainwright, 372 U.S. 335, 345 (1963), they have neither the right to be represented by counsel of their choosing, United States v. Poulack, 556 F.2d 83, 86 (1st Cir. 1977), nor the right to demand different counsel except for good cause. Allen, 789 F.2d at 92.

Nevertheless, six days before the start of trial Nguyen filed his pro se motion. In the motion, Nguyen claimed that his counsel was trying to "coerce" him into pleading guilty.

After receiving Nguyen's motion, the court held a hearing. The court first asked Nguyen if he wanted to add anything to his motion. Nguyen stated that his counsel had not identified a potential defense and had told him that she could not help him at trial. The court then gave his counsel the opportunity to respond. She stated that Nguyen's attitude toward her had changed dramatically as a result of his contact with Malik Nbala. Nbala was a friend of Nguyen's and a self-professed law student. Nguyen's counsel had seen the two conferring when she left an earlier meeting she had with Nguyen. Nguyen's counsel told the court that prior to Nbala's involvement, she had discussed with Nguyen the weight of the evidence against him as well as the government's proposed plea agreement. She continued with these discussions after Nguyen's conference with Nbala. However, she told the court that Nbala's continued involvement with her client made it "impossible" for her to represent her client and that Nguyen was "profoundly dissastisfied" that she had not "found a way out of this for him." She added that "communications are pretty entirely broken down at this point."

The district court asked some follow up questions about Nbala and asked Nguyen if he had anything to further to say.

Nguyen replied that if the court denied his motion he would believe his trial to be unfair.

The court denied the motion, citing three reasons. First, the court suggested that any communication problems likely stemmed from Nguyen's misperception of his attorney's plea negotiations with the government. The court told Nguyen that his attorney had a duty to give him her "best assessment of what his chances were at trial" and that while he had the right to make the "ultimate decision," he should not "misconstrue a lawyer telling you that he or she thinks that you ought to plead with a failure to represent you as best that can be done." Second, the district court described the breakdown as unilateral. The court observed that Nguyen had chosen not to communicate with counsel and that, in its opinion, the breakdown did not appear irreparable. Finally, the court noted the lateness of Nguyen's motion -- specifically that it came less than a week before trial.

The district court did not abuse its discretion in denying Nguyen's motion, as the ruling is supported by all three Allen factors.

First, Nguyen's motion for new counsel, filed six days before trial, was not timely. As we noted in Allen, "Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay." 789 F.2d at 93 (quoting United States v. Llanes, 374 F.2d 712, 717 (2d

-10-

Cir. 1967)). Given the eleventh hour nature of Nguyen's motion, this factor supports the court's decision to deny his motion. See United States v. Reyes, 352 F.3d 511, 515 (1st Cir. 2003) (concluding defendant's motion untimely where filed a week before trial); United States v. Woodard, 291 F.3d 95, 107 (1st Cir. 2002) (concluding defendant's motion untimely where filed thirteen days before trial).

Second, the district court conducted a thorough hearing on Nguyen's motion.[4] The court gave Nguyen an opportunity, which he took, to supplement his written motion with oral testimony. The court asked Nguyen's counsel to explain her thoughts on the substance of Nguyen's motion and asked her follow up questions. After hearing from Nguyen's counsel, it gave Nguyen yet another opportunity to speak. In sum, the court gave Nguyen multiple opportunities to explain the reasons behind his motion and it thoughtfully probed his counsel regarding her view of the situation. This inquiry was clearly sufficient to apprise the court of the merits of Nguyen's motion and was more than adequate. See Reyes, 352 F.3d at 516-17 (holding inquiry adequate where judge asked defendant why he wanted new counsel); Woodard, 291 F.3d at 108 (holding inquiry adequate where district court inquired as to

---

[4] Although a district court is not required to conduct a full formal hearing when presented with a motion for new counsel, it did in this case. See Woodard, 291 F.3d at 108 ("The extent and nature of the inquiry may vary in each case; it need not amount to a full formal hearing.").

the reasons for the motion); Allen, 789 F.2d at 93 (holding inquiry adequate where court gave defendant opportunity both to voice his concerns and to explain reasons for motion).

Nguyen focuses his challenge on the third Allen factor -- conflict resulting in a breakdown in communication. He contends that this factor weighed heavily in favor of the appointment of new counsel for two reasons. First, he argues that there was significant conflict between himself and his counsel regarding trial strategy. He notes that he informed the court that his counsel had not identified a defense and had sought to coerce him into pleading guilty. Second, he suggests that the record reflected a total breakdown in communication. He points to the fact that his counsel stated during the hearing that her communications with Nguyen had broken down. These arguments fail.

Nguyen's first argument is unconvincing for two reasons. First, it is contradicted in part by the record. Although Nguyen's counsel did advise him to consider a plea agreement, she also filed a successful motion to exclude evidence -- an action consistent with trial preparation. Second, there was no evidence of coercion and the district court was not required to award Nguyen new counsel simply because he and his counsel disagreed regarding the merits of a plea. As we noted in United States v. Genao, "[T]he mere fact that a defense attorney and his client disagree about the

advisability of a plea does not justify appointing new counsel." 281 F.3d 305, 313 (1st Cir. 2002) (citing Allen, 789 F.2d at 93).

Nguyen's second argument also fails to gain traction. Despite statements made by Nguyen's counsel, the district court did not abuse its discretion in concluding that the breakdown in communication was a unilateral one that could be repaired. The testimony by Nguyen's counsel strongly suggested that the communication problems stemmed solely from Nguyen's interactions with Nbala and his subsequent change in attitude rather than from any unwillingness of counsel to communicate. Nguyen's choice not to communicate with counsel does not automatically entitle him to substitute counsel.

## 2. The Discovery Claim

All three defendants argue that the government committed a discovery violation by not disclosing the criminal record of the victim and prosecution witness, Tommy Nguyen, until six days before trial. The defendants contend that the delayed disclosure of this evidence warrants a new trial because it limited their ability to impeach Tommy during cross examination.

The government learned about Tommy's criminal record six days before trial and faxed a letter to defense counsel the next day informing them of this fact and notifying them that it was obtaining the record. The government faxed the record to defense counsel two days later and notified the defense that the record

-13-

failed to reflect a potential parole violation by Tommy.  On the second day of trial, defense counsel conducted a voir dire of Tommy regarding his criminal record.  Defense counsel neither requested a continuance nor moved for a mistrial because of the delay.

Prosecutors must provide potentially exculpatory evidence that they are aware of to the defense in a timely fashion.  United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993).[5]  Where a defendant has properly preserved a discovery claim, we review the district court's handling of a delayed disclosure for abuse of discretion.  United States v. Casas, 425 F.3d 23, 43 (1st Cir. 2005).[6]

Because the defendants failed to ask for a continuance, we seriously doubt they have preserved their delayed discovery claim.[7]  In any event, the district court did not abuse its

---

[5]  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence that is potentially useful to impeach a witness, the variety at issue here, is a subset of Brady material called "Giglio" material.  Giglio v. United States, 405 U.S. 150, 153-54 (1972).

[6]  The government persuasively maintains that there was no delayed disclosure at all because it immediately notified defense counsel when it learned of Nguyen's criminal record and faxed the record once the record was in its possession.  For purposes of our analysis we will assume arguendo that there was a delayed disclosure.

[7]  See United States v. Smith, 292 F.3d 90, 102-103 (1st Cir. 2002) ("[D]efense counsel must typically request a continuance to preserve a claim of prejudice by delayed disclosure of evidence."); Sepulveda, 15 F.3d at 1178 ("As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery."); United States v. Diaz-Villafane, 874 F.2d 43, 47 (1st

-14-

discretion in allowing the trial to proceed despite the delayed disclosure. In delayed disclosure cases, we need not address whether the evidence was material[8] unless the defendant can demonstrate that the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case. Smith, 292 F.3d at 102. "The defendant must at a minimum make a 'prima facie' showing of a plausible strategic option which the delay foreclosed." Id. at 104.

The defendants have made no such showing here and it is evident the delay did not hamper their use of Tommy's criminal record. First, the defendants' failure to request a continuance, besides raising the spectre of waiver, causes us to entertain their discovery claim with a significant amount of skepticism. See United States v. Osorio, 929 F.2d 753, 758 (1st Cir. 1991) ("[W]e have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient

_____

Cir. 1989) ("[A defendant's] claim that he was unfairly surprised is severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency."). Although we have said that other actions may preserve a delayed discovery claim, such as requesting a mistrial or moving to exclude evidence, the defendants failed to take these actions as well. See Smith, 292 F.3d at 103 (questioning whether defendant preserved discovery claim where defendant neither asked for a continuance *nor* moved for a mistrial); United States v. Lemmerer, 277 F.3d 579, 587 n. 2 (1st Cir. 2002) (noting that defense counsel, though failing to ask for continuance, preserved discovery claim because of motion to exclude belatedly disclosed evidence).

[8] We discuss the materiality requirement below.

opportunity to use the evidence advantageously."). But even had the defendants been operating on a clean slate, our conclusion would be the same given that the record reflects ample use of the disclosed evidence. Defense counsel cross-examined Tommy regarding his criminal record, getting him to admit that he had Georgia convictions for breaking and entering and driving without insurance. See United States v. Ingraldi, 793 F.2d 408, 412 (1st Cir. 1986) (noting that the impact of the delayed disclosure on defense counsel's cross examination turns in part on "the extent the defendant actually managed to use [the disclosed material] despite the delay"). It is not surprising that defense counsel effectively used this evidence, having had three days to determine how to best put it to use. See Sepulveda, 15 F.3d at 1179 (noting that delayed disclosure did not prevent defendant from effectively preparing and presenting case where defense counsel received evidence while witness was testifying and effectively incorporated its contents into the cross-examination).

Notwithstanding the cross-examination of Tommy about his criminal record, defendants insist that the delay was prejudicial. Van and Cao say there are two potential sources of additional impeachment material that were buried within the disclosed material. First, an investigation of Tommy's social security number gave rise to an inference that "more than one person was improperly using the number." Second, Tommy had different dates of

-16-

birth attributed to him within the various disclosed court documents. The defendants suggest that, given these discrepancies, had the government disclosed Tommy's criminal records earlier they could have either uncovered other crimes Tommy committed or more vigorously pressed him regarding potential dishonesty with government officials about his birth date.

The defendants' speculative arguments about potential additional uses of the disclosed material are unavailing. The defense conducted voir dire of Tommy about his social security number, his birth date and his criminal record. If they believed their inquiry raised red flags, they easily could have requested a continuance in order to conduct additional investigation. They failed to do so. This reflects not only their own satisfaction with their use of the disclosed material in their cross-examination of Tommy but also a conscious decision to forgo a strategic option.

### 3.  Exclusion of Evidence

During the cross-examination of Tommy, Nguyen's counsel sought to introduce evidence for the purpose of impeaching Tommy. The district court excluded the evidence under Rule 403 of the Federal Rules of Evidence. Defendants Nguyen and Van argue this ruling was erroneous. We review a district court's decision to exclude evidence under Rule 403 for an abuse of discretion. United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005).

During cross-examination, Nguyen's counsel asked Tommy a series of questions concerning a nickname Tommy had bestowed upon Nguyen. Tommy admitted that he had initially not known Nguyen's name and had therefore referred to Nguyen as "Fat Guy." The line of questioning was part of Nguyen's defense theory -- that Tommy's "nicknaming" of Nguyen, and not Tommy's failure to repay his debt, was the cause of the July 25 scuffle and not Tommy's failure to repay his debt. Nguyen's counsel asked Tommy on cross examination, "You have something of a temper, don't you [Tommy]?". When Tommy responded, "Not really," Nguyen's counsel attempted to question Tommy about incidents which had allegedly occurred nine months after the collection meeting. The government objected.

At a sidebar after the objection, Nguyen's counsel made an offer of proof concerning two incidents. The first incident involved a verbal argument that occurred between Tommy and Yvonne over a loan. Although the argument resulted in the police being called to the scene, no report was made. The second incident occurred the day after the first. Yvonne and her boyfriend discovered that someone had smashed her boyfriend's car windshield. The police were again called to the scene, and Yvonne reported that Tommy had been drinking all day and that she and her boyfriend saw his car leaving the parking area where the damaged car was parked immediately prior to their discovery of the damage.

Nguyen's counsel suggested that this evidence supported her theory that Tommy had used "fighting words" to incite Nguyen. The district court sustained the government's objection, concluding that the evidence was "too far afield," and added, "We're going to try this case and not some other case that sounds like it's not very conclusive." The court also noted that Nguyen's counsel had made her point about the incitement theory during her cross-examination. Another defense attorney objected to the court's ruling, contending that the evidence was admissible to contradict Tommy's testimony that he did not have a temper.

Nguyen and Van argue that the evidence was admissible under two theories and, further, that the district court's decision to exclude the evidence pursuant to Rule 403 was an abuse of discretion.[9]

Regardless of the merits of the defendants' theories of admissibility, the court's ultimate decision to exclude the evidence under Rule 403 did not constitute an abuse of discretion. Rule 403 states:

> Although relevant, evidence may
> be excluded if its probative

---

[9] Although Van also suggests that the court erred in preventing Nguyen's counsel from presenting her theory of the case, he does not sufficiently develop this argument and thus it is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, the district court gave Nguyen's counsel ample opportunity to pursue the "incitement theory" and only cut off her questioning when she attempted to introduce evidence concerning incidents unrelated to the July 25th beating.

> value is substantially
> outweighed by the danger of
> unfair prejudice, confusion of
> the issues, or misleading the
> jury, or by considerations of
> undue delay, waste of time, or
> needless presentation of
> cumulative evidence.

Fed. R. Evid. 403.

The probative value of the proffered evidence is suspect. The evidence concerned incidents that took place nearly nine months after the July 25 beating and did not involve the defendants. Moreover, the evidence itself was paltry. No police report was taken regarding the first incident, and Tommy was not conclusively linked to the second incident involving the smashed windshield. The district court recognized this, noting that the evidence was both "too far afield," and "not very conclusive." As we have noted in the past, "[o]nly rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988). We cannot say the district court's on-the-spot judgment was erroneous.[10]

---

[10] The defendants also suggest that the district court's Rule 403 analysis was erroneous because of a procedural infirmity in the court's ruling. Specifically, they take issue with the fact that the court did not recite the balancing test set forth in Rule 403. This argument goes nowhere. A court is not required to quote the language of Rule 403 when making such a ruling. See United States

## 4.  Mistrial Motion

Nguyen argues that the district judge should have granted his mistrial motion because he was unduly prejudiced by a police officer's improper testimony at trial.  The testimony concerned the officer's seizure of a weapon from the car Nguyen and the others were traveling in when they were stopped by police.

The testimony should never have been given.  Prior to trial, Nguyen filed a motion in limine to exclude evidence about the discovery of the weapon, a machete, and the motion was granted. Yet when the police officer who stopped the car was asked by the prosecutor on the stand whether he had discovered any "weapons" during a pat down frisk of the car's occupants the police officer responded, "Not on their person.  In the vehicle."  Nguyen's counsel objected to the officer's testimony and moved to strike. The court granted the motion and instructed the jury to "[D]isregard the last portion of the answer." Ultimately, Nguyen's counsel moved for a mistrial arguing that the government intended to offer evidence that the car was registered to Nguyen.  After the government offered not to introduce this evidence, Nguyen's counsel joined Van's counsel in proposing curative instructions.  The court obliged and instructed the jury that:  (1) there was no evidence about ownership of the vehicle; (2) despite the officer's reference

v. De la Cruz, 902 F.2d 121, 123-24 (1st Cir. 1990).

-21-

to a weapon, the only object seized was a "tool of some sort"; (3) the item was not "a gun or some other kind of weapon"; and (4) the item "had nothing whatsoever to do with the alleged assault."

Although at trial Nguyen never claimed the court's instructions were inadequate, he now insists that they failed to neutralize the testimony's prejudicial effect.  Specifically, he contends that the officer's statement regarding the presence of a weapon in the vehicle could have persuaded the jurors that the defendants were the initial aggressors in the scuffle.

We review a district court's denial of a mistrial motion for a manifest abuse of discretion.[11]  United States v. Glenn, 389 F.3d 283, 287 (1st Cir. 2004).  Whenever "a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice." United States v. Reiner, 500 F.3d 10, 16 (1st Cir. 2007); see also Sepulveda, 15 F.3d at 1184 ("[C]ourts have long recognized that, within wide margins, the potential prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions.").

The district court did not abuse its discretion in denying the mistrial motion.  The officer never described the

---

[11]  There is some disagreement regarding whether Nguyen forfeited this argument at trial.  The government suggests that he did because he neither argued that the curative instructions were inadequate nor renewed his mistrial motion.  Because we conclude that there was no error even under the manifest abuse of discretion standard, we do not reach the preservation question.

-22-

"weapon" he seized from the vehicle, and the curative instruction suggested that the officer mischaracterized what he found in the vehicle. Moreover, the government presented no evidence regarding the ownership of the vehicle and thus gave no indication to the jury as to which one of the three men was most likely associated with the "weapon." Because the court gave prompt curative instructions, Nguyen has to argue that he suffered extreme prejudice. Although the officer's unsolicited testimony was unfortunate, the district court did not abuse its discretion in determining its curative efforts prevented such prejudice.

### 5. Prosecution's closing argument

Nguyen and Cao argue that the prosecutor made inappropriate statements during closing argument that prejudiced the outcome of the case, and thus denied them due process. Both defendants take aim at one set of statements made by the prosecutor, and Cao alone challenges additional statements.

Because neither defendant objected to the relevant portions of the prosecutor's closing argument, our review is for plain error. United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006) (internal citation omitted). Under this standard, the defendant must show that "(1) [] an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United

States v. Bennett, 469 F.3d 46, 52 (1st Cir. 2006) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). "An error affects substantial rights if it was 'prejudicial,' meaning that the error 'must have affected the outcome of the district court proceedings.'" Ramirez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002) (citation omitted).

Both defendants challenge statements made by the prosecutor which intimated that Cao attended the final collection meeting to ensure Nguyen did not lose control and unduly harm Tommy. The remarks in question were:

> Let me suggest to you the reason Mr. Cao has to show up is Mr. Van [] can't trust [] Nguyen to just slap [Tommy] around a little. They don't want to hurt him seriously. Do they want the ambulance to come? Do they want the police to come? When people get beaten up, they get upset. They may go to the police.

The defendants contend that these statements inaccurately characterized the evidence. Nguyen argues that nothing in the evidence suggested either that Van did not trust Nguyen or that Cao was supervising Nguyen to make sure he did not get out of hand. Cao advances essentially the same argument.

Arguably, the prosecutor's statements were supported by reasonable inferences drawn from the evidence. See United States v. Grant, 971 F.2d 799, 810 (1st Cir. 1992). The evidence revealed the following: (1) Nguyen never visited Tommy to collect payments alone -- Van accompanied him on the first four visits and Cao on

-24-

the final visit; (2) Cao gave the order to "take care" of Tommy and watched as Nguyen and Quoc beat Tommy; (3) Cao ultimately called off both Nguyen and Quoc after Tommy broke free of the scuffle and also reminded the men that Tommy had a shop and could not run anywhere. This evidence supports the inference that Cao played the role of supervisor during the last visit and Nguyen the role of enforcer. It also could reasonably support, though less comfortably, the inference that Van did not trust Nguyen to collect the debt alone.

Ultimately, whether or not the prosecutor's statements were appropriate they did not amount to plain error. The prosecution presented ample evidence that the July 25th beating was motivated by Tommy's debt. There is no reason to believe the prosecutor's remarks concerning the respective roles played by Nguyen and Cao was the cause of their convictions.

Cao argues that three additional sets of statements by the prosecutor were erroneous. These involved the prosecutor's statements: (1) asking the jury to exercise "common sense"; (2) paraphrasing what Cao said during the final collection meeting with Tommy; and (3) regarding phone records.

First, Cao argues that the prosecutor suggested to the jury that it could convict based on a common sense standard rather than a reasonable doubt standard. The prosecutor said, "And I stress your God-given common sense in this case, because if ever a

verdict should be based just upon your God-given common sense, this is it . . . .Ladies and gentlemen, let me suggest that you get into the real world."

Second, Cao contends that the prosecutor inaccurately paraphrased his comments during the final collection meeting. Tommy testified that after he got off the phone with Van, Cao told the other men to "take care of him and go home."  However, during closing argument, the prosecutor said, "What does Thinh Cao say? Just pay the money, take care of him, we'll go home."  Cao argues that by adding the contraction "we'll," the prosecutor led the jury to believe that Cao considered himself allied with the other two men and that this was not the case.

Finally, Cao claims that the prosecutor committed an error during closing argument by referencing a potential discrepancy in phone records.  During the trial, for the purpose of connecting Cao to Van, the government presented evidence that indicated both that Cao was the subscriber for a certain cell phone number and that there was substantial call traffic between this number and Van's cell phone number in the days leading up to the final collection meeting and on the day of the meeting itself. However, Cao's phone records established that following Cao's arrest and subsequent detention, during a period in which he presumably was not in control of his phone, three outbound calls were made from his number.  All three calls resulted in zero

-26-

airtime minutes. Defense counsel pointed to this evidence as indicating that someone other than Cao was in possession of the phone on the day of the final collection meeting. During closing argument the prosecutor, in addressing defense counsel's theory, suggested to the jury that a mistake in phone records could explain the three calls. Cao argues that the prosecutor's statement had no basis in the evidence.

Regardless of the propriety of these three categories of statements, the remarks did not rise to the level of plain error.

With respect to the prosecutor's common sense remarks, we note that nowhere did the prosecutor imply that common sense is a standard much less that it is a substitute for the reasonable doubt standard. But in any event, when the remarks are placed in the larger context of the closing argument as a whole we are confident that they did not affect the outcome of the proceedings.

The same is true for the prosecutor's statement paraphrasing Cao's comments and the prosecutor's suggestion that Cao's phone records were inaccurate. The government presented ample evidence indicating that Cao was allied with the two others. For example, Cao directed the others to commence and to cease the beating of Tommy. The fact that the prosecutor added the word "we'll" to Cao's statement to the others is insignificant in light of the record evidence. With respect to the prosecutor's comments concerning Cao's phone records, even if the evidence did not

-27-

warrant the inference the phone records may have been inaccurate, a proposition we are inclined to disagree with,[12] the government presented other evidence connecting Cao to Van. Cao admitted to subscribing to the cell phone number that had made the numerous calls to Van in the days leading up to the beating, and phone records indicated that both Cao and Van had called Nguyen numerous times on the day of the collection meeting.

### 6. Reasonable Doubt Instruction

All three defendants argue that the district court committed error when instructing the jury on reasonable doubt. Van objected to the instruction; therefore, if we find the instruction erroneous we must reverse his conviction. Sullivan v. Louisiana, 508 U.S. 275, 279 (1993); United States v. Lopez, 71 F.3d 954, 960 (1st Cir. 1995) ("[A] defective reasonable doubt instruction objected to at trial cannot be harmless error."). Because Cao and Nguyen failed to object, review as to them is for plain error. United States v. Vavlitis, 9 F.3d 206, 211 (1st Cir. 1993).

A reasonable doubt instruction will constitute reversible error if, taken as a whole, it has a "reasonable likelihood" of leading the jury to believe that it can convict on some lesser

---

[12] The government produced exhibits indicating that Cao's phone records could have been inaccurate. For example, Cao's phone records indicated that 55 calls had been made from Cao to Van whereas Van's phone records indicated that 52 such calls had occurred. Such evidence supports a reasonable inference that Cao's phone records were simply inaccurate.

standard of proof than that required under the reasonable doubt standard.  O'Shea, 426 F.3d at 482.

The defendants take issue with a particular portion of the court's reasonable doubt instruction.  This portion reads:

> That brings us to the question of what's a reasonable doubt.  *I'm afraid I can't be a great deal of help to you on this one.  It's a term that pretty much defies definition.  All I can say is that the Government's obligation to prove these elements or to prove the defendant guilty beyond a reasonable doubt does not mean that the Government must prove the defendant guilty beyond all shadow of a doubt or beyond all doubt.*  What it means is that the Government must prove the defendant guilty beyond a reasonable doubt.  And in determining whether a reasonable doubt exists, you should use your common sense to determine what the facts are.
>
> A reasonable doubt may arise from evidence that's been presented to you, or it may arise from a lack of evidence.  I can't provide you with any better definition than that.  The reason you're here is you know what a doubt is, and you know what's reasonable, and it's up to you to decide whether you think the government has proven the things it must prove beyond a reasonable doubt.  (emphasis added).

The defendants criticize the court's decision to immediately follow its statement regarding the difficulty of defining reasonable doubt with a description of reasonable doubt using "negative terms" (i.e., describing what the government did not have to prove).  They contend that this phrasing, along with the court's failure to describe reasonable doubt in "positive

-29-

terms," created a reasonable likelihood that the government's burden of proof was diminished.

We have previously explained that reasonable doubt is difficult to define, see United States v. Munson, 819 F.2d 337, 346 (1st Cir. 1987), and that a court need not define reasonable doubt for a jury. United States v. Rodriguez-Cardona, 924 F.2d 1148, 1160 (1st Cir. 1991). We have also upheld jury instructions that defined reasonable doubt using negative terms. United States v. Whiting, 28 F.3d 1296, 1303-04 (1st Cir. 1994)(noting that government's burden of proof is not likely to be lessened "by an instruction that with a few general phrases indicates that not every doubt is a reasonable one").

The defendants do not argue otherwise. They instead contend that the court's various statements in combination and without a positive definition of reasonable doubt, caused its instruction to be constitutionally defective.

The court's reasonable doubt instruction was not a model instruction and in no way do we endorse it. We have, in the past, warned against attempts to define reasonable doubt noting that such attempts often "result in further obfuscation of the concept." O'Shea, 426 F.3d at 482; United States v. Andujar, 49 F.3d 16, 23 (1st Cir. 1995) (internal quotation and citation omitted).

However, we are mindful that in determining whether an instruction is constitutionally sound, we must view the instruction

as a whole.  <u>United States</u> v. <u>Ranney</u>, 298 F.3d 74, 80 (1st. Cir. 2002) (analysis of reasonable doubt instruction must consider "the entire jury charge").  Though we are troubled by the instruction, given its other defendant-favorable aspects we cannot say that the jury was misled regarding the government's burden of proof.

In particular, the district court did three things that persuade us that its instruction adequately communicated the government's burden.  First, throughout the instruction the court emphasized the government's duty to prove the defendants guilty beyond a reasonable doubt.  All told, it mentioned the government's burden of proof a total of ten times.  <u>See</u> <u>United States</u> v. <u>Burnette</u>, 375 F.3d 10, 21 (1st Cir. 2004) (concluding instruction adequate where, among other things, court referenced government's burden of proof ten times), vacated on other grounds, 543 U.S. 1181 (2005).  Second, the court noted that reasonable doubt could arise either from the evidence that had been presented to the jury or from a lack of evidence.  Third, the court stressed the presumption of innocence afforded to the defendants.  It stated to the jury:

> I told you at the beginning of the trial about the presumption of innocence, that a defendant starts a trial presumed to be not guilty and that presumption remains with him unless and until the Government presents evidence that convinces you beyond a reasonable doubt that he is guilty.  And if the Government doesn't present such evidence, then the presumption of innocence is sufficient to require you to acquit the defendant.

-31-

See O'Shea, 426 F.3d at 482 (instruction adequate where "district court gave a careful and cogent discussion of the presumption of innocence").

Our decision in United States v. Wallace, 461 F.3d 15 (1st. Cir. 2006) provides additional support for our conclusion. There we found no error in a reasonable doubt instruction that was materially the same as the one the district court delivered here. In Wallace, the district court instructed the jury as follows:

> The Government must prove facts sufficient to prove all the elements of the offenses with which the defendant is charged as I have explained. *Now, the Government's obligation to prove the defendant's guilt beyond a reasonable doubt does not mean that it must do so beyond all doubt or beyond any conceivable shadow of a doubt.* What it means is that the Government must prove the defendant's guilt by a reasonable doubt.
>
> *I cannot provide you with the definition of a reasonable doubt.* You know what 'reasonable' means and you know what 'a doubt' means. Therefore it is up to you to decide whether the Government has proved the defendant guilty beyond a reasonable doubt.

461 F.3d at 30 (emphasis added).

Like the defendants in this case, the defendant in Wallace argued that the court's statement that it could not provide the jury with a definition of reasonable doubt, combined with its statement focusing on what the government did not have to prove, impermissibly diminished the government's standard of proof. Id. However, we disagreed after finding other language in the

-32-

instruction that ensured the government's burden of proof was not impermissibly diminished.  Id.  So it is here.

We emphasize that courts must exercise the utmost care when instructing a jury as to reasonable doubt.  In that vein, we note that there is value in consulting the First Circuit Pattern Jury Instruction, § 3.02, and in using it for the guidance it is intended to provide.

## B.  Sentencing Phase

The district court sentenced the defendants to the following terms of incarceration:  Van, 52 months; Nguyen, 46 months; Cao, as a career offender, 150 months.  Nguyen and Cao challenge their sentences.  We address each challenge in turn.

Nguyen's 46 month sentence was within the advisory guideline range of 41-51 months that the probation office proposed in its pre-sentence report ("PSR").  Nguyen did not object to the PSR.

Nevertheless, Nguyen argues that his sentence was unreasonable for two reasons.  First, he argues that the district court's sentence was unduly influenced by erroneous First Circuit precedent.  He claims that we have held that a within-guideline sentence is "presumptively reasonable" and that this causes district courts to favor within-guideline sentences.  He argues that such a presumption is unconstitutional according to Booker v.

<u>United States</u>, 543 U.S. 220 (2005).[13]  Second, he argues that the district court did not adequately consider the factors set forth in 18 U.S.C. § 3553(a) when imposing his sentence.  Specifically, he asserts that the court failed to consider his "history and characteristics," in particular, that:  (1) he was born in Vietnam; (2) he was the oldest of three children; and (3) his family fled from Vietnam in 1975 due to the political unrest there.

We review sentences for reasonableness regardless of whether they fall inside or outside the applicable guideline sentencing range.  <u>United States</u> v. <u>Jimènez-Beltre</u>, 440 F.3d 514, 519 (1st Cir. 2006) (en banc).  Nevertheless, "a defendant who attempts to brand a within-the-range sentence as unreasonable must carry a heavy burden."  <u>United States</u> v. <u>Pelletier</u>, 469 F.3d 194, 204 (1st Cir. 2006).

Nguyen's first argument is legally incorrect.  The Supreme Court has said that it is not improper for a court of appeal to presume that a within-guideline sentence is reasonable. <u>Rita</u> v. <u>United States</u>, 127 S. Ct. 2456, 2467-68 (2007).  But moreover, contrary to Nguyen's contention, we do not attach a presumption of reasonableness to within-guideline sentences.  <u>See</u> <u>Jimènez-Beltre</u>, 440 F.3d at 519; <u>United</u> <u>States</u> v. <u>Taylor</u>, 499 F.3d 94, 102 n.3 (1st Cir. 2007).

---

[13]  Because Nguyen failed to raise his constitutional argument below, this argument is governed by the plain error standard. <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001).

Nguyen's second argument lacks merit for two reasons. First, Nguyen's counsel never mentioned the "history and characteristics" factor at sentencing. The district court can hardly be faulted for not adequately considering an argument that was never made to it. See United States v. Alli, 444 F.3d 34, 41 (1st Cir. 2006) (holding district court's examination of 3553(a) factors adequate, despite defendant's claim that court failed to consider particular § 3553(a) factor, where defendant failed to mention factor at sentencing). But second, and more importantly, notwithstanding the fact that Nguyen's counsel failed to apprise the court of his "history and characteristics," the record indicates that the district court did in fact consider this § 3553(a) factor. The information Nguyen references was set forth in the PSR and the court expressly stated at sentencing, "The Probation Officer has described your upbringing." Moreover, when considering what sentence to impose the court described Nguyen's background as "unfortunate."

We now turn to Cao's sentencing argument. The district court sentenced Cao as a career offender after concluding that he met all the requirements of the career offender provision. Specifically, the court concluded that: (1) Cao was at least 18 years old when he committed the instant felony offense; (2) the felony offense was a crime of violence; and (3) Cao had two prior felony convictions of crimes of violence. See U.S.S.G. § 4B1.1.

Cao's two prior felony convictions included a 1987 New Jersey conviction for (1) armed robbery, (2) theft by extortion, and (3) "terroristic threats" and a 1991 Massachusetts conviction for (1) armed robbery and (2) assault and battery with a dangerous weapon. Cao was sentenced to 3 to 9 years in prison following his New Jersey conviction, and to concurrent terms of 16 to 22 years and 8 to 10 years following his Massachusetts conviction.

Cao argues that the court should not have counted his 1987 New Jersey conviction as a predicate offense. He contends that his 1987 conviction does not satisfy an additional requirement that predicate offenses must meet in order to be counted under the career offender provision. Specifically, he points to U.S.S.G. § 4A1.2(e)(1)'s time limitation. This section reads in part:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted.

Cao argues that because his 1987 conviction resulted in a sentence exceeding thirteen months, and because his sentence was imposed eighteen years and four months before the commencement of the instant offense, the court could not use the 1987 conviction as a predicate offense.

We disagree. Whether or not Cao's reading of this clause of section 4A1.2(e)(1) is sound, because Cao violated conditions of parole that attached to his New Jersey conviction the district

-36-

court was still entitled to include the 1987 conviction as a predicate offense under a different clause of section 4A1.2(e)(1).

This second clause of section 4A1.2(e)(1) provides:

> Also count any prior sentence of imprisonment exceeding one year and one month, *whenever imposed*, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

U.S.S.G. § 4A1.2(e)(emphasis added).

As a result of his parole revocation, Cao's 1987 New Jersey sentence was reinstated in 2002 and he served an additional one year and seventeen days in connection with the New Jersey case. The district court was entitled to count Cao's 1987 sentence as a predicate offense because: (1) he was sentenced for a period exceeding 13 months ("a prior sentence of imprisonment exceeding 13 months"), (2) the sentence was imposed in 1987 ("whenever imposed"), and (3) the sentence "resulted" -- because of Cao's parole violation and the subsequent reinstatement of the New Jersey sentence -- in Cao being incarcerated on August 31, 2002 (incarcerated "within fifteen years of the defendant's commencement of the instant offense").

Cao, for his part, protests this use of his parole revocation. He contends that his parole revocation cannot affect the career offender analysis because parole revocation does not involve an "adjudication of guilt." Cao's argument is misguided. The "adjudication of guilt" took place when Cao was convicted in

1987.  See Morrissey v. Brewer, 408 U.S. 471, 480-81 (1972). Moreover, Cao's argument ignores the fact that the career offender guidelines treat sentences imposed pursuant to a revocation of parole as part of the original sentence.  U.S.S.G.  § 4A1.2(k)(1) provides:

> In the case of a prior revocation of . . . parole, add the original term of imprisonment to any term of imprisonment imposed upon revocation.

Thus, under the guidelines, parole revocation sentences relate back to the original adjudication of guilt.

### III.  Conclusion

For the foregoing reasons, we affirm the convictions and sentences in all respects.

**Affirmed**.